1996–NMSC–073

931 P.2d 69

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**James Jimmy BROWN, Defendant–
Appellant.**

No. 21980.

Supreme Court of New Mexico.

Dec. 5, 1996.

T. Glenn Ellington, Chief Public Defender, David Henderson, Assistant Appellate Defender, Santa Fe, for Defendant–Appellant.

Tom Udall, Attorney General, Gail Mac-Questen, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

## OPINION

FRANCHINI, Justice.

{1} Defendant Jimmy Brown ("Brown") appeals from a conviction of first-degree, depraved mind murder. *See* NMSA 1978, § 30–2–1(A)(3) (Repl.Pamp.1994). Following a jury trial, Brown was sentenced to life imprisonment for the murder conviction. On appeal, we address a single issue: Whether the trial court erred in refusing to instruct the jury that Brown's intoxication could be considered in determining the mental state required for conviction of depraved mind murder. We hold that a fact finder may consider evidence of extreme intoxication when determining whether a defendant possessed the requisite mental state of "subjective knowledge" for first-degree depraved mind murder. Accordingly, we reverse and remand for new trial. Because we answer this first question affirmatively, we do not address Brown's allegation of prosecutorial misconduct during closing argument.

{2} *Statement of facts and proceedings.* On August 23, 1993, Oscar Zapata was shot and killed at the house of his girlfriend, Josephine Calanshe. The next morning, Brown was arrested and charged on an open count of murder. The evidence presented to the jury at Brown's trial, viewed in the light most favorable to sustain the verdict, established the following facts.

{3} In early 1993, Brown met Josephine Calanshe ("Josephine"), and the two became friends. Though they dated briefly, by the summer of that same year, they were both dating other people. Nonetheless, Josephine and Brown remained friends; in fact, Brown and his friends would often "hang out" at her house drinking beer. Sometimes they would drink for a number of days in succession, which is what occurred prior to the murder in question.

{4} On Monday, August 23, 1993, the day of the homicide, Brown, along with Toby and Richard Horton ("Toby" and "Richard"), began drinking beer around noon, and continued drinking throughout the afternoon. That evening they went to Josephine's house, where they continued to drink beer. Though all three men gave differing estimates of the amount of alcohol they consumed that day, by all estimates quite a large quantity of beer had been consumed throughout the day of the murder, approximately four and one-half cases (over 100 bottles of beer).

{5} When Brown, Toby, and Richard arrived at Josephine's house, a number of people were already there, including Josephine, her boyfriend, Oscar Zapata (the victim), Brandy Matta ("Brandy"), Josephine's two children, and Brandy's younger brother and sister. Another person, Albert Padilla ("Albert"), arrived at Josephine's house shortly after Brown. Josephine introduced everyone to Oscar. Oscar and Brown shook hands and

there was no apparent conflict or friction between the two.

{6} Over the course of the evening, people were scattered throughout the house. For most of the evening, Brown, Toby, Albert, and Richard were drinking beer in the living room, and Josephine, Brandy, and Oscar were in the bedroom. The children were in the playroom off the living room. Occasionally, Oscar, Josephine, or Brandy visited with the group in the living room. No arguments or fights occurred at any time prior to the killing. At some point in the evening, Brown showed Albert a shotgun that he had brought to Josephine's house the previous Friday. After Albert examined it, Brown placed the shotgun behind the stereo.

{7} At the time of the homicide, Josephine and Oscar were kissing on the bed in Josephine's bedroom. Oscar was lying halfway on top of Josephine and half-way on the bed. Also in the bedroom were Josephine's two-year-old son, Arthur, who was standing by the bed, and Brandy. Brandy testified that while she was plugging a portable fan into the wall socket, she heard a loud sound. She then turned and saw Brown standing at the foot of the bed holding a shotgun. She saw Oscar lying on top of Josephine. He had been shot in the back of the head. Josephine yelled for Brandy to get Arthur out of the room. Brandy grabbed Arthur and began dragging him from the room. At that time, Brandy stated that Brown pointed the shotgun at her and Arthur, but he did not shoot.

{8} The sound of the shotgun awakened Toby, who had been passed out on the couch, and he ran into the room and grabbed at the shotgun. The gun discharged a second time, hitting the ceiling. The evidence conflicts regarding whether Toby or Brown was holding the gun when it discharged a second time. Toby testified that he grabbed the shotgun and told Brown to get out of the house. Toby then ran out of the house carrying the shotgun and threw it down in the front yard. The police found the shotgun several blocks away.

{9} Albert's statement to the police on the night of the shooting differed from his trial testimony. In his statement to the police, he stated that he ran to Josephine's room, saw Brown facing Toby, saw Brown holding the shotgun, and Oscar lying on top of Josephine. At trial, Albert testified that he ran out of the house without going to Josephine's bedroom.

{10} Defendant Brown took the stand and testified that he was so intoxicated on the night of the murder that he did not recall anything about the shooting. He testified that he had blackout episodes in the past due to excessive alcohol consumption and had been a heavy drinker since he was fifteen years old—he was nineteen at the time of the murder. He did, however, recall the earlier events of the day; he recalled going to Josephine's house, meeting Oscar, sitting in the living room, and showing the shotgun to Albert. He testified that he had just met Oscar that same night and that he had no reason to kill him. The last thing Brown remembered before the shooting was falling asleep on the couch. The next thing he remembered he was standing in the doorway of Josephine's room. At that point, he recalled hearing screaming but did not know the reason for the screams. He also recalled seeing Toby facing him holding a shotgun. When Toby told him to get out of there, Brown ran. Brown testified that, at that time, he did not know what had happened at Josephine's house or why Toby had told him to leave.

{11} The State's pathologist testified that Oscar died from a single shot to the back of the head fired from three to six feet away.

{12} The State sought a first-degree murder conviction based on the theories of deliberate intent murder and depraved mind murder. At the close of the State's case, the trial court directed a verdict on deliberate intent murder, but denied the motion for directed verdict on depraved mind murder, relying on the evidence that Brown fired the gun into a room occupied by several people. Uniform jury instructions were given on second-degree murder and first-degree depraved mind murder, but an instruction on voluntary intoxication submitted by the Defendant was refused.

{13} *The mental state of "subjective knowledge" is an essential element of the*

*offense of first-degree depraved mind murder.* We must first examine the elements of depraved mind murder to determine whether a jury may take into consideration evidence of intoxication when determining the existence of the mental state required for the offense. Because New Mexico is one of only a few states that divides unintentional murder based upon risk-creating conduct into two degrees of homicide, first-degree depraved mind murder and second degree murder, our inquiry must necessarily distinguish the elements of depraved mind murder from second-degree murder. *See generally* Leo M. Romero, *Unintentional Homicides Caused By Risk–Creating Conduct: Problems in Distinguishing Between Depraved Mind Murder, Second Degree Murder, Involuntary Manslaughter, and Noncriminal Homicide in New Mexico,* 20 N.M.L.Rev. 55 (1990) [hereinafter *Romero* ]. We note that New Mexico is also one of only a few states to include depraved mind murder within the category of first degree murder, making it a capital felony. *See* Romero, *supra,* at 61. Because the consequences for committing first-degree murder are far more serious than those for second-degree murder, it follows that the legislature intended to sufficiently distinguish the offense of first-degree depraved mind murder from second-degree murder. In *State v. Garcia,* 114 N.M. 269, 272, 837 P.2d 862, 865 (1992), we specifically noted that the distinction between second-degree murder and first-degree murder is of the utmost importance in the administration of New Mexico's criminal justice system.

{14} Because depraved mind murder involves a higher degree of recklessness, one previously-recognized distinction between the two degrees of homicide is the number of persons subjected to the risk of death. *See State v. Sena,* 99 N.M. 272, 274, 657 P.2d 128, 130 (1983); *State v. DeSantos,* 89 N.M. 458, 461, 553 P.2d 1265, 1268 (1976). This factor alone, however, does not constitute the determinative factor in differentiating between first and second-degree murder. *See Romero, supra,* at 63–65 (discussing the lack of support for the multiple person/single person distinction). While "[t]he number of persons

may be a factor in assessing the degree of the *risk* disregarded, . . . it should not be determinative of the degree of *murder* charged." *Romero, supra,* at 63. Though the definitions of depraved mind murder and second-degree murder contain similar elements, *see State v. Johnson,* 103 N.M. 364, 370, 707 P.2d 1174, 1180 (Ct.App.), *cert. quashed,* 103 N.M. 344, 707 P.2d 552 (1985), a major distinction between the two degrees of murder is based upon the culpable mental states required by the two offenses.

■ {15} First-degree murder is reserved for the most blameworthy or "the most heinous and reprehensible" class of homicides; thus, the difference in culpable mental states is crucial in justifying the more serious penal consequences of first-degree murder.[1] *Garcia,* 114 N.M. at 272, 837 P.2d at 865; *see also* Romero, *supra,* at 60 (explaining that clear, principled distinctions between degrees of homicide result in the more heinous conduct being punished more severely). Because the legislature has deemed that a killing performed with a depraved mind is an especially serious homicide, deserving of punishment equal to that imposed for other forms of first-degree murder, we conclude that the legislature intended the offense of depraved mind murder to encompass an intensified malice or evil intent. *See State v. Ibn Omar–Muhammad,* 102 N.M. 274, 278, 694 P.2d 922, 926 (1985) (explaining depraved mind murder requires extremely reckless conduct evidencing *total* indifference for the value of human life); *Johnson,* 103 N.M. at 368, 707 P.2d at 1178 (explaining crime of depraved mind murder requires the defendant act with outrageous recklessness and that the fatal conduct must be performed with a depraved kind of wantonness).

■ {16} Depraved mind murder "is the killing of one human being . . . by any act greatly dangerous to the lives of others, *indicating a depraved mind regardless of human life.*" Section 30–2–1(A)(3) (emphasis added). "Depraved mind" is defined as "[a] corrupt, perverted, or immoral state of mind" constituting "the highest grade of malice . . .

---

1. NMSA 1978, Section 30–2–1(A) classifies first degree murder as a capital felony, which may be punished by death or life imprisonment, NMSA 1978, 31–18–14(A) (Repl.Pamp.1994).

equatable with malice in the commonly understood sense of ill will, hatred, spite or evil intent." *Black's Law Dictionary* 440–41 (6th ed.1990). The defendant's depraved-mind action must be performed with a "wicked and malignant heart." *State v. Hernandez,* 117 N.M. 497, 499, 873 P.2d 243, 245 (1994). Accordingly, we have held that depraved mind murder requires proof that the defendant had "subjective knowledge" that his or her act was extremely dangerous to the lives of others. *Ibn Omar–Muhammad,* 102 N.M. at 277, 694 P.2d at 925; *State v. McCrary,* 100 N.M. 671, 673, 675 P.2d 120, 122 (1984); *Johnson,* 103 N.M. at 368, 707 P.2d at 1178. The required *mens rea* element of "subjective knowledge" serves as proof that the defendant acted with a "depraved mind" or "wicked or malignant heart" and with utter disregard for human life. Second-degree murder, on the other hand, contains a component involving an "objective knowledge" of the risk, without the required showing that the risk-creating act was performed with a wicked and malignant heart. To the extent that *State v. Beach,* 102 N.M. 642, 645, 699 P.2d 115, 118 (1985), holds that second-degree murder contains the same "subjective knowledge" element as depraved mind murder, it is expressly overruled.

{17} The first-degree depraved mind murder provision does not, by its terms, require that the defendant have "subjective knowledge." However, our uniform jury instructions for criminal cases define the standards for proof of the culpable knowledge for depraved mind murder as follows:

> The defendant is charged with first degree murder by an act greatly dangerous to the lives of others indicating a depraved mind without regard for human life. For you to find the defendant guilty ..., the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> .      .      .      .      .
>
> 4. The defendant *knew* that his act was greatly dangerous to the lives of others....

SCRA 1986, 14–203 (emphasis added). Furthermore, the committee commentary, which is persuasive on this instruction, also specifi-

cally distinguishes the *mens rea* required for depraved mind murder from that required for second-degree murder by providing that the instruction for first-degree depraved murder sets forth a *subjective test,* whereas the instruction for second-degree murder requires only an objective test.

{18} This Court first imposed the "subjective knowledge" element for depraved mind murder in *McCrary,* wherein we cited to both the language of Uniform Jury Instruction for depraved mind murder as well as the committee commentary to that instruction. 100 N.M. at 673, 675 P.2d at 122. Since the initial imposition of the "subjective knowledge" element, New Mexico courts have uniformly required the state to prove this element for first-degree depraved mind murder. *See Ibn Omar–Muhammad,* 102 N.M. at 277, 694 P.2d at 925 (holding jury instruction for depraved mind murder improper where it set out "objective" standard of knowledge of the risk rather than "subjective" standard, entitling defendant to new trial); *State v. Omar–Muhammad,* 105 N.M. 788, 791, 737 P.2d 1165, 1168 (1987) (distinguishing mental state required for depraved mind murder of "subjective knowledge" from mental state required for vehicular homicide of "conscious wrong-doing"); *Johnson,* 103 N.M. at 368, 707 P.2d at 1178 (noting "subjective knowledge" required element for depraved mind murder); *see also Romero, supra,* at 65–67 (noting that New Mexico appellate courts have generally supported the requirement of subjective knowledge for depraved mind murder).

{19} Therefore, to establish depraved mind murder requires that the state prove each of the elements beyond a reasonable doubt, including the "subjective knowledge" element. In this case, Brown must have had the *subjective or actual knowledge* of the high degree of risk involved in his conduct. As we will explain below, intoxication was relevant to determining the existence of the *mens rea* element of "subjective knowledge," and was therefore a valid consideration.

■ {20} *The trial court denied Brown's theory of the case when it failed to instruct the jury on intoxication with regard to the*

*element of subjective knowledge required for a conviction for depraved mind murder.* In the instant case there was evidence that Brown was intoxicated, meaning that a "mental disturbance" resulted from his drinking which in turn caused his inability to recall the murder. *See* Model Penal Code, § 2.08(5)(a) (1985). This raises the question of whether Brown actually possessed the "subjective knowledge" or the requisite awareness that his acts were greatly dangerous to the lives of the others, indicating depraved-mind action performed with a wicked and malignant heart.

█ {21} " '[I]ntoxication' means a disturbance of mental or physical capacities resulting from the introduction of substances into the body." *Id.* "Like mistake and mental illness, a state of intoxication may also negate a required offense element, and when raised in this context, is a failure of proof defense." 1 Paul H. Robinson, *Criminal Law Defenses* § 22, at 75 (1984) [hereinafter *Defenses* ]. American jurisdictions early on expressed the policy that voluntary intoxication provided no defense to a criminal act. *See generally* Annotation, *Modern Status of the Rules as to Voluntary Intoxication as Defense to Criminal Charge,* 8 A.L.R.3d 1236 (1966 & Supp.1995). This area of law was greatly influenced by courts' moral disapproval of drunkenness. *Id.* at 1245. In addition, the courts' decisive rejection of the voluntary intoxication defense was based both on the belief that the defense could be easily fabricated and that such a personal vice should not be used as a shield to criminal liability. Timothy P. O'Neill, *Illinois' Latest Version of the Defense of Voluntary Intoxication: Is It Wise? Is It Constitutional?,* 39 DePaul L.Rev. 15, 17–20 (1989) (providing a brief history of intoxication defense). Recognizing the extreme harshness of this rule, gradually courts began to allow juries to consider evidence of the defendant's intoxication when relevant to the *mens rea* element. O'Neill, *supra,* at 18 (citing to early cases allowing juries to consider voluntary intoxication to negate the required intent element of a crime). By the end of the nineteenth century, most American jurisdictions had adopted the common-law approach which permitted intoxication to be considered

where it negates the required element of specific intent. Jerome Hall, *Intoxication and Criminal Responsibility,* 57 Har.L.Rev. 1045, 1049 (1944).

█ {22} A "specific-intent crime" is defined as one for which a statute expressly requires proof of " 'intent to do a further act or achieve a further consequence.' " *State v. Bender,* 91 N.M. 670, 671, 579 P.2d 796, 797 (1978) (quoting *People v. Hood,* 1 Cal.3d 444, 82 Cal.Rptr. 618, 626, 462 P.2d 370, 378 (1969)). A general intent crime, however, requires only a "conscious wrongdoing," or "the purposeful doing of an act that the law declares to be a crime." *Ibn Omar–Muhammad,* 102 N.M. at 278, 694 P.2d at 926. New Mexico courts have long followed the same common law specific-general intent approach, allowing voluntary intoxication as a consideration only for specific-intent crimes, including premeditated first-degree murder. *See, e.g., State v. Campos,* 122 N.M. 148, 921 P.2d 1266 (1996) (holding intoxication is only a defense to specific intent crimes and not general intent crimes); *State v. Tapia,* 81 N.M. 274, 275–76, 466 P.2d 551, 552–53 (1970) (citing earlier cases). Under this approach, evidence of voluntary intoxication is not admissible for what are referred to as general-intent crimes. *Campos,* at 157, 921 P.2d at 1275.

█ {23} We note, however, that this specific-general intent approach has been criticized because it is not always clear whether a particular offense is a specific-intent crime or a general-intent crime. *See* G. Fletcher, *Rethinking Criminal Law* 846, 849–50 (1978); *Defenses, supra,* § 65(e), at 297–300 (explaining other problems with the specific-general approach). Accordingly, some commentators have suggested rejecting this approach in favor of asking simply whether the defendant's intoxication was so severe as to negate whatever intent is required by the crime charged. *See, e.g.,* 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 4.10, at 554 (1986) [hereinafter *Lafave & Scott* ]; *see also Defenses, supra,* § 65(a), at 290 (explaining that a number of jurisdictions no longer apply the specific-general intent approach due

to a trend among jurisdictions to recodify their criminal statutes). In fact, a number of jurisdictions have rejected the common-law approach and instead follow the Model Penal Code § 2.08(1)–(2), which permits voluntary intoxication to negate purpose or knowledge, but not recklessness. *Defenses, supra,* § 65(a), at 290. This Court, however, recently affirmed New Mexico's approach by applying the general-specific intent analysis to exclude voluntary intoxication evidence for the crime of felony murder. *See Campos* at 157–58, 921 P.2d at 1275–76. Therefore, we do not, by this opinion, wholly abandon New Mexico's common law general-specific intent approach with respect to all offenses. In the instant case, however, we hold that the specific-general intent analysis does not apply to depraved mind murder.

{24} The case before us presents a unique circumstance involving an express mental state, specifically that of "subjective knowledge." Until 1980 our homicide statutes contained no other express state of mind requirements besides specific intent and premeditation. We therefore must determine whether intoxication may also negate an express mental state besides the intent to achieve a further act or consequence.

{25} Before 1980, murder was broadly defined as an unlawful killing with malice aforethought. *See Smith v. State,* 89 N.M. 770, 779, 558 P.2d 39, 48 (1976). In 1980, however, the legislature amended the murder statutes, eliminating the term "malice aforethought" and repealing the obsolete definitions of "express" and "implied" malice. *State v. Ortega,* 112 N.M. 554, 565, 817 P.2d 1196, 1207 (1991). In place of those expressions, the legislature introduced more descriptive terms for the required mental states. In *Ortega,* we concluded that the malice required for first and second-degree murder is "an intent to kill or an intent to do an act greatly dangerous to the lives of others or with the knowledge that the act creates a strong probability of death or great bodily harm." *Id.* The malice required for depraved mind murder is an intent to commit an act imminently dangerous to others *or* with the subjective knowledge that the act creates a very high degree of risk to the lives

of others, indicating a depraved mind regardless of human life. *See id.*

{26} As a consequence of these statutory changes, as interpreted by New Mexico courts, the legislature redefined and distinguished the mental states required for first-degree depraved mind murder and second-degree murder by introducing a new "subjective knowledge" element to first-degree depraved murder. Unlike second-degree murder, the new "subjective knowledge element" of depraved mind murder does not include the imputed knowledge that an ordinary person would be expected to have. Therefore, assuming as a result of Brown's intoxication, he did not subjectively know that his acts created a very high degree of risk to the lives of others, the only rationale for finding him guilty of depraved mind murder would be to exclude relevant evidence of voluntary intoxication. Such a specific exclusion would prevent intoxication evidence from being admitted to negate the mental state of "subjective knowledge." While the legislature could have easily written a specific exclusion rule into the change in the prior law, it did not.

{27} In this case, the general-specific intent analysis is inapplicable to the definition of depraved mind murder because it requires proof of the specific *mens rea* element of "subjective knowledge" as a condition to criminal liability. The specific-general intent common-law approach does not take into consideration the existence of a "heightened" *mens rea* aside from specific intent. *See Defenses, supra,* § 65(e), at 300 (explaining this approach's failure to "recognize the variety of culpability requirements contained in offense definitions"). The capacity to possess "subjective knowledge" may be just as affected by intoxication as the capacity to intend to do a further act. Intoxication may affect mental processes and prevent a person from either coolly deliberating or subjectively realizing that his or her act creates a very high degree of risk to the lives of others. Intoxication, however, usually has no effect on whether a person is purposefully doing something declared to be a crime, that is, a general-intent crime. Even though depraved mind murder cannot be considered a "specific-intent" crime because it requires proof of

"subjective knowledge," as we have explained, it does not fall squarely among the class of crimes referred to as the "general-intent" crimes. In fact, the depraved mind or extreme indifference aspect required for first-degree depraved mind murder brings it more in line with the "specific intent" or cool deliberation requirements of Section 30–2–1(A)(1) (first-degree premeditated or willful killing). For these reasons, absent express legislative guidance to the contrary, we consider evidence of intoxication relevant to the formation of the heightened *mens rea* element of depraved mind murder.

{28} In a recent United States Supreme Court case, *Montana v. Egelhoff,* —— U.S. ——, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996), the Court considered whether a Montana statute, which excluded evidence of the defendant's voluntary intoxication when determining the existence of the requisite mental state of "knowing" for deliberate murder, violated Due Process. Though profoundly divided on result and rationale, in a five to four decision, the Court upheld the statute as constitutional. Justice Scalia, writing for a four-justice plurality, cited to the historical disallowance of intoxication evidence prior to the nineteenth century and concluded that the evidentiary rule excluding intoxication evidence could not be considered a violation of a fundamental principle. Our case, however, is distinguishable from *Egelhoff.* As we previously noted, New Mexico does not have a statute that excludes evidence of voluntary intoxication.

{29} Despite its inapplicability to the case before us, *Egelhoff* is notable because its analysis, in both the dissent and the special concurrence, focuses upon Montana's authority to define the elements of an offense. Unlike the majority opinion, in which Justice Scalia determined that the rule excluding evidence of intoxication, Mont.Code Ann. § 45–2–203 (1995), was an evidentiary rule, *id.* at ——, 116 S.Ct. at 2016, Justice Ginsburg, in her concurring opinion, construed the Montana legislature's enactment of this voluntary-intoxication exception as *redefining* the elements of the crime of deliberate murder to exclude evidence of voluntary intoxication. *Id.* at ——, 116 S.Ct. at 2023.

When "[c]omprehended as a measure redefining mens rea, § 45–2–203 encounters no constitutional shoal." *Id.* at ——, 116 S.Ct. at 2024. However, Justice O'Connor, in a dissent joined by three other Justices, concluded that the Montana legislature had not redefined the elements of the offense and that the rule excluding intoxication evidence was clearly incompatible with the legislature's decision to require a subjective mental state as an element of deliberate murder. *Id.* at ——, 116 S.Ct. at 2030. To determine whether excluding intoxication evidence violated a fundamental principle of justice, Justice O'Connor concluded that the Court must consider more than the historical disallowance of intoxication evidence. She noted that due process guarantees are dependant upon the legislature's definition of the crime, *id.* at ——, 116 S.Ct. at 2032, and that the rule's blanket elimination of a critical category of defense violates the fundamental principle of justice that "the defendant has a right to the fair opportunity to put forward his defense." *Id.* at ——, 116 S.Ct. at 2031. Therefore, she concluded that the Montana Supreme Court properly held the "voluntary intoxication exception" to be unconstitutional. *Id.* at ——, 116 S.Ct. at 2031.

{30} In New Mexico, it is clear that the crime of depraved mind murder requires the mental state of "subjective knowledge." Unlike Montana, the New Mexico legislature has not chosen to redefine its elements with the enactment of a rule that excludes relevant evidence of voluntary intoxication. In fact, distinguishing the different *mens rea* elements of first-degree depraved mind murder and second-degree murder is essential to New Mexico's statutory homicide scheme. *See Garcia,* 114 N.M. at 272, 837 P.2d at 865.

{31} Although we recognize concerns that a voluntary intoxication defense may be abused or fabricated, these concerns are no different from those arising with respect to any type of exculpatory evidence presented at trial. However, it is for the jury to weigh the credibility of the witnesses and the weight to be given that evidence. Moreover, such concerns should not lessen the state's burden to prove, beyond a reasonable doubt, all elements of the offense. A defendant has

a due process right not to be convicted of a crime unless the state has proven the defendant's guilt beyond a reasonable doubt, *Mulaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and "*the overriding presumption of innocence with which the law endows the accused ... extends to every element of the crime.*'" *Ortega*, 112 N.M. at 562, 817 P.2d at 1204 (quoting *Sandstrom v. Montana*, 442 U.S. 510, 522, 99 S.Ct. 2450, 2458, 61 L.Ed.2d 39 (1979) (quoting *Morissette v. United States*, 342 U.S. 246, 274–75, 72 S.Ct. 240, 255–56, 96 L.Ed. 288 (1952))).

{32} The State relies on authority from other jurisdictions which generally hold that drunkenness cannot negate a depraved mind murder by "blotting out consciousness of risk." 2 *LaFave & Scott, Supra*, § 7.4, at 205; *see also Defenses, supra*, § 65(b), at 296 (explaining that rules regarding voluntary intoxication defense must "take account of an actor's culpability in causing his own intoxication"). On this point, however, cases from other jurisdictions are not persuasive because of New Mexico's unique position requiring a subjective knowledge element to establish depraved mind murder as well as its unique classification of depraved mind murder as first-degree murder. Additionally, other jurisdictions have failed to reach a consensus on this subject and afford little assistance to our analysis. *See Defenses, supra*, § 65(a) (explaining that American jurisdictions have taken six different approaches in permitting voluntary intoxication defense).

{33} According to Brown's theory of the case, he was so severely intoxicated that he was not subjectively aware of the seriousness of the risk entailed by his conduct, as required for depraved mind murder. At the time of the commission of the crime, Brown's lack of rancor and his apparent confusion in the aftermath of the murder appear to negate the "wicked and malignant heart" required for depraved mind murder. Brown had just been introduced to the victim that night, and they shook hands amicably a few hours before the shooting. In light of the undisputed evidence that there was no hostility between the victim and Brown prior to the murder, along with the evidence of Brown's excessive consumption of alcohol, the issue of whether Brown actually possessed a depraved mind, i.e., a subjective realization of the risk, is especially important.

{34} Pursuant to Brown's theory of defense, he submitted a jury instruction that endeavored to instruct the jury to take into consideration the evidence of his intoxication and its effect on the requisite mental state of subjective knowledge. Despite the intoxication evidence, the trial court refused to give Brown's requested instruction on intoxication. When evidence at trial supports the giving of an instruction on a defendant's theory of the case, failure to so instruct is reversible error. *State v. Trammel*, 100 N.M. 479, 481, 672 P.2d 652, 654 (1983). The refused jury instruction set forth the express mental state of "subjective knowledge" required for finding a defendant guilty of depraved mind murder. Intoxication is clearly relevant to the formation of that state of mind. Accordingly, the defendant must be allowed to show, by reference to intoxication, the absence of that state of mind. Therefore, in light of the evidence, the jury should have been instructed that, if they find that as a result of voluntary intoxication the defendant was not aware that his conduct was greatly dangerous to the lives of others, indicating a depraved heart, *or* if they have a reasonable doubt that the defendant was capable of being aware of the risk, then they should find the defendant not guilty of the offense of first-degree depraved mind murder. If the jury finds the defendant not guilty of first-degree depraved mind murder, they may then determine whether the defendant is guilty of second-degree murder, which does not allow evidence of voluntary intoxication to negate any elements of the offense. *See Campos* at 157–58, 921 P.2d at 1275–76. Because we hold that intoxication is a circumstance that may be considered when determining the subjective state of mind of a defendant charged with depraved mind murder, the trial court's refusal to give this instruction effectively denied Brown the right to present his theory of the case and constitutes reversible error.

{35} *Conclusion.* We hold that, when the crime charged is depraved mind murder, evidence of intoxication may be taken into consideration by the jury when determining the existence of the required *mens rea* of "subjective knowledge." We hold that evidence of intoxication may be considered to reduce first-degree depraved mind murder to second-degree murder. It may not be used, however, to reduce second-degree murder to voluntary manslaughter, or involuntary manslaughter or to completely excuse a defendant from the consequences of his unlawful act. We therefore reverse and remand this case for a new trial in accordance with this opinion.

**IT IS SO ORDERED.**

RANSOM and McKINNON, JJ., concur.

BACA, Chief Justice, dissents.

MINZNER, Justice, dissents.

MINZNER, Justice, dissenting.

I respectfully DISSENT. I would affirm the judgment and sentence.

The New Mexico Legislature has enacted a statute defining murder in the first degree in three ways: (1) as a "willful, deliberate, and premeditated killing"; (2) as a death caused "in the commission of an attempt to commit any felony"; and (3) as a death caused "by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life." NMSA 1978, § 30–2–1(A) (1994 Repl.Pamp.). This case requires us to revisit the Legislature's intent in classifying as first degree murder a death caused "by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life." § 30–2–1(A)(3). In previous opinions, this Court has characterized that particular form of murder as "first-degree depraved mind murder." *See, e.g., State v. Ibn Omar–Muhammad,* 102 N.M. 274, 694 P.2d 922 (1985). We also have held that to prove depraved mind murder the State must show that the defendant had "subjective knowledge" that his act was greatly dangerous to the lives of others. *Id.* at 277, 694 P.2d at 925. In this opinion the majority holds that "[t]he required *mens rea*

element of 'subjective knowledge' serves as proof that the defendant acted with a 'depraved mind' or 'wicked or malignant heart' and with utter disregard for human life." Op. at 728, 931 P.2d at 73. Further, in this opinion the majority indicates that the State was required to prove that Brown "had the *subjective or actual knowledge* of the high degree of risk involved in his conduct." *Id.* at 728, 931 P.2d at 73. Thus, in this case, the State was required to prove that Brown actually, or subjectively, knew, rather than only that he should have known, that his conduct was greatly dangerous to the lives of others. I believe that the evidence offered at trial was sufficient to support a jury determination that Brown had the necessary subjective, or actual, knowledge. I do not believe the majority disagrees.

However, in this opinion the majority also holds that "intoxication was relevant to determining the existence of the *mens rea* element of 'subjective knowledge,' and was therefore a valid consideration." *Id.* at 728, 931 P.2d at 73. The majority reverses Brown's conviction on the basis that the trial court erred in failing to instruct the jury on intoxication *"with regard to the element of subjective knowledge required for a conviction for depraved mind murder." Id.* at 728, 931 P.2d at 73. The majority concludes that "there was evidence that Brown was intoxicated, meaning that a 'mental disturbance' resulted from his drinking which in turn caused his inability to recall the murder." *Id.* at 728–729, 931 P.2d at 73–74. I respectfully disagree with this conclusion. Because I am not persuaded that the evidence offered at trial was sufficient to support a jury determination that Brown, by reason of intoxication, did not have the subjective or actual knowledge required by the statute, I cannot say the trial court erred in failing to instruct the jury on intoxication.

Brown testified that he did not recall what happened because he had consumed an excessive amount of alcohol. The majority suggests this evidence is sufficient to support a jury determination that Brown lacked subjective or actual knowledge that his conduct was greatly dangerous. *See generally State v. Privett,* 104 N.M. 79, 80, 717 P.2d 55, 56

(1986) (holding intoxication to a degree that made specific intent impossible was a valid defense to a charge of willful, premeditated, first-degree murder). I respectfully disagree. Perhaps I do not understand what the majority means by subjective or actual knowledge. As I understand the phrase, the State introduced sufficient evidence to support the jury's verdict, but Brown did not introduce sufficient evidence to support an instruction on the defense of intoxication. I conclude Brown did not introduce sufficient evidence to support the instruction because there was no evidence that he lacked the capacity to know his conduct was greatly dangerous and no evidence that he lacked any knowledge relevant to the question of whether his conduct was greatly dangerous.

Brown's testimony might lead a jury to find that he fired unintentionally and thus that his culpability arose only from carrying a firearm while intoxicated. Nevertheless, evidence of his failure to recall the incident ought not to be sufficient to support an instruction that he lacked the requisite subjective or actual knowledge, if he fired intentionally. Brown fired a shotgun at close range to two people locked in an embrace on a bed, killing one of the two with a bullet to the back of the head. At least four people other than Brown occupied the room at the time of the shooting. If Brown acted intentionally, the jury was entitled to infer that he knew he created a high degree of risk to more than one person. That is, the jury was entitled to infer that if Brown fired at Oscar Zapata intentionally, he knew he was endangering Josephine Calanshe.

The question underlying Brown's right to an instruction on intoxication would seem to be whether the evidence is sufficient to show that, if he fired intentionally, he could have done so without the actual knowledge that his act was greatly dangerous to others. I am not persuaded there is any evidence to that effect. Thus, I do not believe the record in this case contains enough evidence to show that Brown's intoxication actually impaired his ability to know that his conduct was greatly dangerous to the lives of others. *Cf. State v. Lovato,* 110 N.M. 146, 793 P.2d 276 (Ct.App.) (upholding denial of instruction on intoxication in defense of aggravated battery charge, where no evidence of effect of intoxication at time of stabbing, and defendant had a clear recall of his actions at that time), *cert. denied,* 110 N.M. 72, 792 P.2d 49 (1990).

The opinion seems to require the instruction on intoxication whenever there is evidence of heavy drinking. Thus, the majority opinion may be understood to encompass a holding that to support a conviction for depraved mind murder the State must prove a mental state that is the equivalent of first-degree premeditated or willful killing and that any evidence of intoxication is sufficient to support the defense that a defendant lacked the required mental state. Perhaps the majority believes that no act committed by someone who is intoxicated can satisfy the Legislature's intent in defining depraved mind murder. If the majority opinion does encompass such holdings, the opinion seems inconsistent with *Privett.*

I believe the opinion in fact goes too far in construing the statute that defines murder. The opinion suggests that the New Mexico Legislature has defined depraved mind murder as having a particular mental state. That suggestion does not find support in the text of the statute, which defines depraved mind murder as a death caused by an act that indicates a particular state of mind. I admit, as I must, that in construing the various forms of first degree murder and in evaluating the sufficiency of the evidence necessary to support different degrees of murder, we have produced a body of law that provides the thinnest of distinctions between depraved-mind murder and second-degree murder. Notwithstanding that reality, the facts of this case are not a proper vehicle to create a greater distinction or to eliminate the one we have created.

On these facts, I believe the dispositive jury question was whether Brown acted unintentionally or intentionally. If he acted unintentionally, he was guilty of involuntary manslaughter. If he acted intentionally, he was guilty of depraved-mind murder as our cases have developed the statutory definition provided by the Legislature for the crime it has classified as first degree murder under Section 30–2–1(A)(3). I think the evidence that

Brown fired at close range, hitting Oscar Zapata in the back of the head, in a room occupied by several people, supports a finding of intentional conduct, and subjective or actual knowledge sufficient to support a conviction for depraved-mind murder, and that the evidence of intoxication is not sufficient to show impairment at that time. *Cf. State v. Lovato.* However, even if we thought Brown might not have seen the other two people in the room and known he was endangering them, I believe we could not say he was unaware of the person Oscar Zapata was embracing. I am willing to concede that a conviction of depraved mind murder might depend on a state of mind that intoxication would negate, but I am not persuaded that the evidence of depraved-mind murder in this case supports the defense.

In this case, I respectfully suggest the subjective or actual knowledge requirement seems to serve a limited function, the function of justifying the right to an instruction. That is, the existence of the requirement of subjective or actual knowledge seems to be enough in itself to require an instruction on the defense of intoxication. That result seems to me to require the State to prove an even more culpable mental state than is required for first-degree premeditated or willful killing. *See Privett,* 104 N.M. at 80, 717 P.2d at 56 (requiring evidence of impairment in establishing defense of lack of specific intent to willful, premeditated first-degree murder). I believe that result lacks any support in the text of the murder statute.

If intoxication is a defense to depraved-mind murder, I have difficulty understanding why it is not a defense to second-degree murder, at least on these facts. Yet in *State v. Campos,* 122 N.M. 148, 921 P.2d 1266 (1996), we very clearly said it was not. I believe it is possible that depraved-mind murder either requires a higher degree of recklessness than second-degree murder, in which case intoxication in theory should not be a defense if we follow *Campos,* or that it requires knowledge of a particular sort not required for second-degree murder, in which case intoxication might be a defense on specific facts. If the jury believed Brown's testimony, however, I think it would have had to find that he lacked even the general criminal intent required for second-degree murder or voluntary manslaughter. *See* NMRA 1996, 14–141 ("A person acts intentionally when he purposely does an act which the law declares to be a crime.") If we recognize the defense here, I think we have a difficult time reconciling not only *Campos,* but also explaining why intoxication is not a defense to voluntary manslaughter. *See* NMRA 1996, 14–220 ("For you to find the defendant guilty of voluntary manslaughter, the State must prove ... [t]he defendant knew that his acts created a strong probability of death or great bodily harm...."). *Cf.* NMRA 1996, 14–210 ("For you to find the defendant guilty of second-degree murder, the state must prove ... [t]he defendant knew that his acts created a strong probability of death or great bodily harm....").

For all these reasons, I respectfully DISSENT. I would affirm the trial court's judgment.

BACA, C.J., concurs.