This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                                    NO. 30,073

**DARIO FABIAN MIRABAL**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Albert "Pat" Murdoch, District Judge**

Gary K. King, Attorney General
William Lazar, Assistant Attorney General
Santa Fe, NM

for Appellant

Law Works L.L.C.
John A. McCall
Albuquerque, NM

for Appellee

**MEMORANDUM OPINION**

**VIGIL, Judge.**

Defendant appeals his conviction for second degree murder and two counts of aggravated battery on the sole ground that the district court judge committed reversible error in failing to give his requested jury instructions on defense of another. Having concluded that there was sufficient evidence to support giving the requested instructions, we reverse. As this is a memorandum opinion, and the parties are familiar with the case, we discuss the relevant facts in the context of the parties' arguments.

**STANDARD OF REVIEW**

A defendant is entitled to a jury instruction on his theory of the case if there is evidence to support the instruction, and the failure to give a requested instruction which the evidence supports constitutes reversible error. *State v. Brown*, 1996-NMSC-073, ¶ 34, 122 N.M. 724, 931 P.2d 69. "For a court to issue a [defense of another] instruction, there need be only enough evidence to raise a reasonable doubt in the mind of a juror about whether the defendant lawfully acted in [defense of another]. If any reasonable minds could differ, the instruction should be given." *State v. Sandoval*, 2011-NMSC-022, ¶ 17, 150 N.M. 224, 258 P.3d 1016 (internal quotation marks and citation omitted); *State v. Rudolfo*, 2008-NMSC-036, ¶ 27, 144 N.M. 305, 187 P.3d 170. In making these determinations, we "review the evidence in the light most favorable to the giving of the . . . defense of another instruction." *Sandoval*,

2

2011-NMSC-022, ¶ 2 (alteration, internal quotation marks, and citation omitted).

**FACTS**

We briefly summarize the pertinent evidence. Defendant, his older cousin David Gabaldon, and Joseph Flores, whom Defendant regarded as his brother-in-law, were all standing on the third-floor balcony outside Defendant's apartment. They became embroiled in a verbal confrontation with three men (the victims, Joshua Bean, Lamar Lewis, and Paul Dickens), who were on the balcony immediately below them on the second floor. The verbal confrontation quickly escalated into threats of physical violence, and the three men rushed up the stairs and charged at Defendant, Gabaldon, and Flores on the third-floor balcony. Gabaldon said they came up so fast, he "didn't have time to think."

As the three men were approaching, Defendant heard one of the men say, "Fuck you" and "I'll kill you. I'll bitch your ass. I will lay you out." Defendant took this threat literally because he knew one of the men had recently kicked down his own mother's door, and called his own mother "a fucking bitch." Gabaldon heard one of the men say, "Well, you better have a knife with you." Gabaldon said he "was scared, you know. I just saw three big black guys come up, you know. . . . I just thought there was going to be a real nasty fight." Gabaldon saw them coming, waving their hands back and forth, cursing him, Flores, and Defendant. Gabaldon felt it was likely

he was going to get hurt, and he would have gotten a weapon to protect himself if he could have. A neighbor who witnessed the incident said that after the men were on the third floor, he heard someone say, "Somebody go get my gun."

When the three men got to Defendant's apartment, one of them punched Defendant in the face, and he fell backwards. The three men then started beating on Defendant. At trial Defendant testified, "I don't remember any of them kicking me or anything, but they were pretty much pummeling me pretty good. I started blacking out, seeing bits and pieces. I'm trying to hit whoever, whatever I can, trying to keep them off of me." Defendant said it was like a swarm of bees attacking him. The next day, Defendant was interviewed by the police and said, "I blacked out, you know, when we were fighting, I was like blacking out. Only little bits and pieces I remember." Gabaldon was trying to break up the fight, and pulled Defendant out of the fight as Flores went into the fight, and the three men then started beating Flores. Gabaldon said that Defendant "was just out of it for, you know, a couple of seconds, and then he saw that [Flores] needed help, so he went back in." Gabaldon said he has never seen anyone hit as hard as Defendant and Flores were hit. Flores was hit several times in the face and fell down when he was hit in the temple. After Flores fell, he was kicked and punched in the stomach and head, mostly in the head. The next thing Flores remembered was hearing one of the African-Americans say, "I think I have

4

been stabbed," and he heard another one say, "Let's get out of here."

The neighbor described the fight on the balcony of the third floor as "a big blur because they were all fighting[.]" He was afraid someone was going to get thrown off the balcony, twenty-five feet above the ground, and die. Camille Padilla, who was dating Dickens, went outside when she felt vibrations from the fighting upstairs. Upon opening the door and going outside, she heard the wooden slats on the railing on the third floor splitting, and she ran up the stairs to the third floor. She "saw all of the guys just kind of in a mess." She described the fight as "a brawl, just five guys fighting, is what I mean by a mess." She could not tell who was hitting who, but she could hear the thud of fists. In his investigation, Detective Guenther confirmed that the wooden slats on the railing appeared to have been freshly broken.

Dickens testified that during the melee he saw Defendant run into his apartment, while Lewis and Bean continued hitting and slugging Flores, and he then started "pushing" Flores. To someone coming out of the apartment at that time, it would have looked like "three on one." Defendant ran out of the apartment and stabbed Dickens in the face. Dickens retreated to the staircase and started yelling, "He has a knife." Dickens then saw Lewis and Bean still fighting with Defendant and the "shorter, huskier male" (apparently Flores), and Dickens saw Defendant stab Bean, who then dropped out of the fight and walked away. Lewis and Flores continued to fight, and

Defendant stabbed Lewis.

**ANALYSIS**

The district court judge instructed the jury on self defense. However, Defendant's requested instructions on defense of another were refused on the basis that "From [Defendant's] testimony, we are talking about his motivations why he took the actions he took, and there is nothing from his own testimony that says he acted in the defense of others." This reasoning is flawed because our decisions do not require a defendant to testify why he took the actions he did to warrant a defense of another instruction. *See Sandoval*, 2011-NMSC-022, ¶¶ 10, 19 (concluding that defense of another and self-defense instructions were warranted by the evidence although the defendant did not testify); *State v. Duarte*, 1996-NMCA-038, ¶ 7, 121 N.M. 553, 915 P.2d 309 (rejecting the State's argument that because the defendant did not testify, he was not entitled to a defense of another instruction, where the evidence otherwise supported giving the instruction).

Defendant was entitled to defense of another instructions if:  (1) there was an appearance of immediate danger of death or great bodily harm to Gabaldon or Flores as a result of being attacked by the victims; (2) Defendant believed that Gabaldon or Flores were in immediate danger of death or great bodily harm from the victims and stabbed the victims to prevent that death or great bodily harm; and (3) the apparent

6

danger to Gabaldon or Flores would have caused a reasonable person in the same circumstances to act as Defendant did. *See* UJI 14-5172 NMRA ("Justifiable homicide; defense of another."); UJI 14-5184 NMRA ("Defense of another; deadly force by defendant."); *Sandoval*, 2011-NMSC-022, ¶ 17. We address whether each element was satisfied, bearing in mind that we are required to view the evidence in the light most favorable to giving the instruction.

**An Appearance of Immediate Danger of Death or Great Bodily Harm**

The evidence is sufficient to cause reasonable minds to differ as to whether there was an appearance of immediate death or great bodily harm to Gabaldon and Flores. This includes evidence of the circumstances, coupled with threats to kill; evidence of a possible gun; and a statement that "you better have a knife with you." In addition, consistent with UJI 14-131 NMRA, the jury was instructed that "great bodily harm" means "an injury to a person which creates a high probability of death or results in serious disfigurement or results in loss of any member or organ of the body or results in permanent or prolonged impairment of the use of any member or organ of the body." Tested by this definition, and without repeating the evidence set forth above, there was an appearance of immediate great bodily harm being inflicted upon Gabaldon and Flores. Thus, we determine that there was evidence sufficient to support the first element of the instruction.

**Defendant's Belief of Danger of Death or Great Bodily Harm and Action to Prevent Such Death or Great Bodily Harm**

We now turn to whether the evidence is sufficient to cause reasonable minds to differ as to whether Defendant believed that Gabaldon or Flores were in immediate danger of death or great bodily harm from the victims and stabbed the victims to prevent Gabaldon or Flores death or great bodily harm.

In addition to the foregoing evidence, Defendant testified that during the verbal altercation leading up to the fight, he could see that Gabaldon and Flores were getting scared: "David and Joe, you know, they're–I'm getting very angry. David and Joe are getting scared. I could see that they were scared, you know. I could see that they were frightened." Defendant testified that he did not close the door to his apartment when Bean, Lewis, and Dickens were approaching because he would have left Gabaldon and Flores outside "to deal with three very angry, violent people" and that when Bean, Lewis, and Dickens were approaching, Defendant was "blocking them from David and Joseph." Further, Defendant said, "You know, if they are willing to come and aggressively this way, where are you gonna go? You are not going to be able to escape these men. You know, we're all overweight gentlemen, and we don't run that fast, and I see how fast they were running, and I know I wasn't gonna be able to outrun any single one of them."

The State argues that these statements are not probative of Defendant's state of

8

mind when he stabbed the victims because they relate to what happened beforehand, and why he did not retreat. In addition, the State points out multiple references in Defendant's testimony and other statements he made before the trial that the fight was "three on one" and that Gabaldon and Flores were not involved in the fight; that Defendant acted to protect himself from the assailants; and that he was not aware of the location of Gabaldon and Flores during their fight. Besides this testimony, the State points out that Defendant never specifically testified that he believed Gabaldon and Flores were in danger of immediate death or great bodily harm and acted to prevent that from occurring. Moreover, the State asserts the fears of others involved in the fight or witnessing the fight are not probative of Defendant's own subjective fear.

We disagree with the State's assertions because they are each made in a vacuum without taking into account the totality of the circumstances confronting Defendant. For example, Defendant's testimony about what occurred immediately before any blow was struck could support a belief for his actions during the fight. Moreover, the fact that Defendant testified does not negate all the other evidence in the case. Even if conflicting evidence exists, so long as reasonable minds could differ regarding the elements, the instruction should be given. *See Rudolfo*, 2008-NMSC-036, ¶ 27.

"A defendant's knowledge or intent generally presents a question of fact for a

jury to decide." *State v. Wasson*, 1998-NMCA-087, ¶ 12, 125 N.M. 656, 964 P.2d 820. Further, "[i]ntent is subjective and is almost always inferred from other facts in the case." *State v. Frank*, 92 N.M. 456, 458, 589 P.2d 1047, 1049 (1979). Conflicts in the testimony are for the fact finder to weigh and resolve. *See State v. Rivera*, 2010-NMCA-109, ¶ 16, 149 N.M. 406, 249 P.3d 944 ("Conflicts in the evidence, even within the testimony of a witness, are to be resolved by the fact finder at trial."), *cert. granted*, 2010-NMCERT-012, 150 N.M. 493, 263 P.3d 270.

In *State v. Cooper*, 1999-NMCA-159, ¶ 18, 128 N.M. 428, 993 P.2d 745, we held that a conflict in a defendant's testimony regarding his belief did not preclude his self-defense claim. The defendant in *Cooper* stated that he was not afraid of the victim, and then later testified that he was afraid of the victim. *Id.* Thus, the State argued that the defendant's testimony that he was not afraid precluded his right to a self-defense instruction. *Id.* We disagreed, determining that whether the defendant was fearful of the victim was a "classic issue for the jury to decide[,]" and therefore, the instruction was warranted. *Id.*

Importantly, there is no evidence that Defendant ever affirmatively stated that he was not acting in the defense of Gabaldon or Flores when he stabbed the victims. And, although Defendant did not affirmatively state that he was acting in defense of Gabaldon or Flores, he also never denied acting in their defense or stated that he was

10

not fearful for them. However, evidence was presented from which the requisite intent can properly be inferred, and the State's argument overlooks Defendant's testimony, "I don't remember any of them kicking me or anything, but they were pretty much pummeling me pretty good. I started blacking out, seeing bits and pieces. I'm trying to hit whoever, whatever I can, trying to keep them off of me."

Thus, viewing the evidence in the light most favorable to the instruction, we conclude that under the evidence presented, reasonable minds could differ as to whether Defendant believed that Gabaldon and Flores were in immediate danger of death or great bodily harm from the victims and that he stabbed the victims to prevent that injury.

**Reasonableness of Defendant's Acts**

Having concluded that under the evidence, reasonable minds could disagree about whether (1) there was an appearance of immediate danger of death or great bodily harm to Gabaldon or Flores as a result of being attacked by the victims, and (2) Defendant believed that Gabaldon or Flores was in immediate danger of death or great bodily harm from the victims and stabbed the victims to prevent that death or great bodily harm, we also conclude (3) that under the evidence reasonable minds could differ about whether the apparent danger to Gabaldon or Flores would have caused a reasonable person in the same circumstances to act as Defendant did. *See State v.*

11

*Gallegos*, 104 N.M. 247, 252, 719 P.2d 1268, 1273 (Ct. App. 1986), *abrogated on other grounds by State v. Alberico*, 116 N.M. 156, 167, 861 P.2d 192, 203 (1993).

**CONCLUSION**

The district court having committed reversible error in refusing to give Defendant's requested instructions on defense of another, we reverse and remand for a new trial.

**IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**CYNTHIA A. FRY, Judge**