IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2017-NMSC-011

Filing Date: January 26, 2017

Docket No. S-1-SC-35508

STATE OF NEW MEXICO,

        Plaintiff-Appellee,

v.

MARCOS SUAZO,

        Defendant-Appellant.

CERTIFICATION FROM THE NEW MEXICO COURT OF APPEALS
Jeff F. McElroy, District Judge

Bennett J. Baur, Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
John Kloss, Assistant Attorney General
Santa Fe, NM

for Appellee

OPINION

CHÁVEZ, Justice.

{1}     Defendant Marcos Suazo became agitated while roughhousing with his friend Matthew Vigil. Suazo retrieved his shotgun and pointed it at Vigil. Vigil grabbed the shotgun and placed the barrel in his mouth. Suazo pulled the trigger, killing Vigil and severely injuring his friend Roger Gage, who was standing behind Vigil. A key contested issue in this case was whether Suazo knew the shotgun was loaded when he pulled the trigger.

1

**{2}**     Two potentially reversible errors occurred during trial.  First, at trial Suazo sought to introduce testimony from two witnesses who saw him approximately one hour after the shooting and heard him claim that he did not know the shotgun was loaded.  The district court excluded the testimony as inadmissible hearsay.  Second, over Suazo's objection, the prosecution persuaded the court to depart from the uniform jury instruction regarding second-degree murder, which has existed since 1981,[1] by modifying the mens rea element.  Instead of requiring the jury to find beyond a reasonable doubt that "[Suazo] knew that his acts created a strong probability of death or great bodily harm," the modified instruction changed the mens rea element to "knew or should have known."  *See* UJI 14-210 NMRA.

**{3}**     Among other crimes, Suazo was convicted of second-degree murder and aggravated battery with a deadly weapon.  He appealed his second-degree murder conviction to the Court of Appeals, contending that the district court erred by excluding the witness testimony and by modifying the uniform jury instruction for second-degree murder.  The Court of Appeals certified his case to this Court pursuant to Rule 12-606 NMRA and NMSA 1978, Section 34-5-14(C) (1996) due to the significant public importance of the jury instruction issue.  *State v. Suazo*, order at 3 (N.M. Ct. App. Sept. 4, 2015) (non-precedential).  We accepted certification and address both issues.

**{4}**     First, we affirm the district court's exclusion of the hearsay evidence because the district court did not abuse its discretion in finding that Suazo's statements, which were overheard one hour after the shooting, were neither excited utterances nor present sense impressions.  Second, we hold that the district court erred by modifying the uniform jury instruction for second-degree murder because in 1980 the Legislature amended the definition of second-degree murder to specifically require proof that the accused knew that his or her acts created a strong probability of death or great bodily harm.  1980 N.M. Laws, ch. 21; *see* NMSA 1978, § 30-2-1(B) (1980).  Because the modified instruction misstated an essential element, we reverse Suazo's conviction for second-degree murder and remand for a new trial.  *See State v. Dowling*, 2011-NMSC-016, ¶ 17, 150 N.M. 110, 257 P.3d 930 ("When a jury instruction is facially erroneous, as when it directs the jury to find guilt based upon a misstatement of the law, a finding of juror misdirection is unavoidable.").

## I.     BACKGROUND

**{5}**     Suazo had spent most of the day drinking and visiting with his longtime friends, Vigil and Gage, at the trailer where he lived and in other locations in and around Talpa, New Mexico.  Vigil and Suazo were roughhousing throughout most of the day.  The two friends often wrestled this way when they were together.

---

[1]NMSA 1978, UJI Crim. 2.11 (1981), committee commentary ("Element 2 of UJI 2.10 and of UJI 2.11 were . . . revised in 1981 to be consistent with the 1980 amendment to Section 30-2-1 NMSA 1978."); *see also* UJI 14-211 NMRA (1989).

**{6}** Sometime in the early afternoon, Vigil remarked that Suazo had a nice shotgun, and Gage asked to see it. When Suazo brought out the shotgun, Gage opened it to make sure that it was not loaded. At Gage's request, Suazo disassembled and reassembled the gun. When they finished with the gun, Gage saw Suazo place it against the wall near the back door of the trailer. Gage was certain that the gun was not loaded at that point.

**{7}** Later that afternoon, Suazo and Vigil were wrestling outside again. Suazo told Vigil not to mess with him because he had just lost his brother. The roughhousing continued. Vigil tried to push Suazo against a car, and then Suazo rushed into the trailer. Suazo's girlfriend, Shania Lujan, heard him cock the shotgun. At trial she testified that she told Suazo to be careful with the gun and that he responded "Don't worry, it's not loaded." However, she had previously given a statement that Suazo had only responded "Leave me alone." She testified that Suazo then held the shotgun with one hand and pointed it at Vigil while standing in the doorway of the trailer. She said that Vigil laughed and then grabbed the barrel of the gun and stuck it into his own mouth. At this point, Gage was standing almost directly behind Vigil. Suazo pulled the trigger and the gun fired. Vigil was killed and Gage was seriously injured. It is not clear when the gun was loaded and who loaded it.

## II.    DISCUSSION

### A.    The district court did not abuse its discretion by excluding certain statements by Suazo as hearsay

**{8}** Suazo sought to elicit testimony from two witnesses at trial regarding statements he made approximately an hour after the shooting, between 4:40 and 5:00 p.m. Elaine Medina and Rosemary Cruz, Suazo's stepmother, testified that Suazo told them he had killed his best friend, he did not know the gun was loaded, and he did not understand what had happened. Medina testified that when Suazo made these statements he was curled up in a ball and crying hard, and she had never seen him cry like that. Similarly, Cruz testified that he appeared drunk, he seemed "very upset," and he was crying "a lot" when he made the statements. The State objected to the witnesses' statements as hearsay, but defense counsel argued that the statements should be admitted under the excited utterance and present sense impression exceptions to the hearsay rule. *See* Rule 11-803(1)-(2) NMRA. The district court sustained the State's objections and excluded the evidence.

**{9}** Although the Court of Appeals only certified the jury instruction issue to this Court, we take this opportunity to resolve Suazo's claim that the district court erroneously excluded the witness testimony about statements that he made after the shooting. *See State v. Orosco*, 1992-NMSC-006, ¶ 2 n.2, 113 N.M. 780, 833 P.2d 1146 (stating that this Court has jurisdiction over the entire case following acceptance of certification). "We examine the admission or exclusion of evidence for abuse of discretion, and the trial court's determination will not be disturbed absent a clear abuse of that discretion." *State v. Stanley*, 2001-NMSC-037, ¶ 5, 131 N.M. 368, 37 P.3d 85. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We

cannot say the trial court abused its discretion by its ruling unless we can characterize [the ruling] as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citations omitted). We conclude that there was no abuse of discretion in this case.

**{10}** There is no doubt that Suazo's anguished statements to Medina and Cruz were hearsay because they were out-of-court statements offered to prove what they asserted—that Suazo did not realize the shotgun was loaded and he did not mean to kill Vigil. *See* Rule 11-801 NMRA (defining as hearsay out-of-court statements offered to prove the truth of what they assert). Such statements are inadmissible unless an exception applies. Rule 11-802 NMRA.

**{11}** A statement that would otherwise be hearsay can be admitted under the excited utterance exception when it "relat[es] to a startling event or condition" and is "made while . . . under the stress or excitement" caused by that event or condition. Rule 11-803(2). "[T]he theory underlying the excited utterance exception is that the exciting event induced the declarant's surprise, shock, or nervous excitement which temporarily stills capacity for conscious fabrication and makes it unlikely that the speaker would relate other than the truth." *State v. Flores*, 2010-NMSC-002, ¶ 47, 147 N.M. 542, 226 P.3d 641 (internal quotation marks and citations omitted). Thus, "to constitute an excited utterance, the declaration should be spontaneous, made before there is time for fabrication, and made under the stress of the moment." *Id.* (internal quotation marks and citations omitted). In determining whether to admit a statement under the excited utterance exception, the district court should consider the totality of the circumstances and

> consider a variety of factors in order to assess the degree of reflection or spontaneity underlying the statement. These factors include, but are not limited to, how much time passed between the startling event and the statement, and whether, in that time, the declarant had an opportunity for reflection and fabrication; how much pain, confusion, nervousness, or emotional strife the declarant was experiencing at the time of the statement; whether the statement was self-serving[; and whether the statement was] made in response to an inquiry[.]

*State v. Balderama*, 2004-NMSC-008, ¶ 51, 135 N.M. 329, 88 P.3d 845 (alterations in original) (internal quotation marks and citations omitted).

**{12}** Under the totality of the circumstances, in this case the district court did not abuse its discretion by excluding testimony regarding Suazo's statements to Medina and Cruz after the shooting. Prior to making the statements, Suazo drove away from the crime scene with his girlfriend and asked her to take the batteries out of his phone. He told her during the drive that he was "gonna go away for a long time." He made several stops, including at his stepmother's house, where he hid the shotgun. The approximately one hour that elapsed between the shooting and the statements, coupled with Suazo's intervening actions and

statements, could reasonably be interpreted to indicate that he reflected on what had happened and the gravity of his situation, and therefore his later statements were not sufficiently spontaneous so as to assure their reliability and qualify them as excited utterances.

{13}     We likewise reject Suazo's claim that it was error for the district court not to admit the statements under the present sense impression hearsay exception.  The present sense impression exception applies to statements "describing or explaining an event or condition, made while or immediately after the declarant perceived it."  Rule 11-803(1).  Again, given the length of time and Suazo's intervening actions between the shooting and the statements, the district court properly exercised its discretion to refuse to apply this exception and exclude the testimony as hearsay.  *See Flores*, 2010-NMSC-002, ¶¶ 51-53 (explaining that the contemporaneity of the event with the timing of the statement is the critical consideration in analyzing whether a hearsay statement qualifies as a present sense impression).

**B.     The district court erred by including "should have known" in the jury instruction for second-degree murder**

{14}     At the conclusion of Suazo's trial, the State tendered a modified jury instruction for second-degree murder.  New Mexico's uniform jury instruction for second-degree murder would require the jury to find beyond a reasonable doubt that Suazo "knew that his acts created a strong probability of death or great bodily harm" to Vigil or another.  UJI 14-210. The State's modified jury instruction in this case inserted "knew or should have known" in place of the word "knew," but was otherwise consistent with the model instruction.  The distinction between "knew" and "should have known" was central to this case because if the jurors believed that Suazo did not realize that the shotgun was loaded and the shooting was therefore an accident, as he claimed, they could have reasonably found that he *should have known* of the probability of death or great bodily harm to Vigil because he obviously did not inspect the gun to determine if it was loaded.  The district court gave the State's proposed jury instruction over defense counsel's objection.  Suazo contends that the district court erred by adding the phrase "or should have known" in instructing the jury on the mens rea required for second-degree murder.

{15}     We review the jury instruction in this case for reversible error because Suazo preserved his objection at trial.  *State v. Cabezuela*, 2011-NMSC-041, ¶ 21, 150 N.M. 654, 265 P.3d 705.  We conclude that there is reversible error when the jury instructions, taken as a whole, cause juror confusion by "fail[ing] to provide the juror[s] with an accurate rendition of the relevant law."  *Id.* ¶ 22 (internal quotation marks and citation omitted); *see also* Rule 5-608(A) NMRA ("The court must instruct the jury upon all questions of law essential for a conviction of any crime submitted to the jury.").  "When a jury instruction is facially erroneous, as when it directs the jury to find guilt based upon a misstatement of the law, a finding of juror misdirection is unavoidable."  *Dowling*, 2011-NMSC-016, ¶ 17.  To ascertain whether the challenged instruction in this case accurately stated the law, we must determine whether the requisite mens rea for second-degree murder is satisfied by a jury

5

finding that Suazo should have known that his acts created a strong probability of death or great bodily harm to Vigil. This inquiry requires us to interpret the mens rea component of our second-degree murder statute. "Our primary goal when interpreting a statute is to determine and give effect to the Legislature's intent." *Cook v. Anding*, 2008-NMSC-035, ¶ 7, 144 N.M. 400, 188 P.3d 1151.

**{16}** We begin with the plain language of the statute, which is "[t]he primary indicator of legislative intent." *State v. Johnson*, 2009-NMSC-049, ¶ 10, 147 N.M. 177, 218 P.3d 863. Pursuant to Section 30-2-1(B),

> Unless he is acting upon sufficient provocation, upon a sudden quarrel or in the heat of passion, a person who kills another human being without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death he [or she] *knows* that such acts create a strong probability of death or great bodily harm to that individual or another.

(Emphasis added.) Under the statute, a defendant must know that his or her acts create a strong probability of death or great bodily harm; there is no express requirement that a defendant "should have known." *Id.*; *see also* UJI 14-210 (instructing jurors that they must find that "[t]he defendant knew that his [or her] acts created a strong probability of death or bodily harm" to convict for second-degree murder). The statute's plain language and New Mexico's uniform jury instruction require that the defendant possess knowledge of the probable consequences of his or her acts. *See* § 30-2-1(B); UJI 14-210. By contrast, neither the statute nor the jury instruction explicitly mentions whether a reasonable person "should have known" of the probable consequences as a mens rea standard. We must give effect to this plain language unless we detect some ambiguity in the statute that requires a different interpretation. *State v. Maestas*, 2007-NMSC-001, ¶ 14, 140 N.M. 836, 149 P.3d 933.

**{17}** We are not persuaded by the State's reliance on *State v. Brown* as a source of ambiguity in the statute that requires us to read the statutory term "knows" to encompass an objective knowledge of the risk through a "should have known" standard. 1996-NMSC-073, ¶ 16, 122 N.M. 724, 931 P.2d 69. In *Brown*, this Court determined that a jury may consider evidence of intoxication when a defendant has been charged with first-degree depraved mind murder because the defendant's "*subjective or actual knowledge* of the high degree of risk involved in his conduct" is an essential element of that offense. *Id.* ¶¶ 13, 19, 35. As part of our analysis in *Brown*, we distinguished between the culpable mental states required by first- and second-degree murder. *Id.* ¶¶ 14, 16. To that end, we opined that a defendant's "subjective knowledge" of the risk under depraved mind murder constituted proof of a "wicked or malignant heart" and "utter disregard for human life," while second-degree murder only required an "objective knowledge of the risk" without any showing that the act was performed with a wicked or malignant heart. *Id.* ¶ 16 (internal quotation marks omitted). Our Court's discussion of the mens rea requirement for second-degree murder in *Brown* was unnecessary to the resolution of that case and was therefore dicta.

**{18}** Our differentiation between a defendant's subjective and objective knowledge of the risk was intended to draw a principled distinction between first-degree depraved mind murder and second-degree murder. *See id.* ¶ 16. This issue has vexed New Mexico courts since 1980, when New Mexico's current statutory definitions of the mens reas for murder in the first- and second-degree were enacted. 1980 N.M. Laws, ch. 21. The amended statute changed the mens rea for second-degree murder from "malice aforethought" to knowledge that a defendant's acts created a strong probability of death or great bodily harm. *Compare id. with* NMSA 1953, § 40A-2-1 (1963). After this new language was enacted, courts and commentators alike noted the difficulty in distinguishing between the knowledge requirements for first-degree depraved mind murder (knowledge that an act is greatly dangerous to the lives of others, indicating a depraved mind without regard for human life) and second-degree murder (knowledge that an act creates a strong probability of death or great bodily harm to the victim or another person). *See* Leo M. Romero, *Unintentional Homicides Caused by Risk-Creating Conduct: Problems in Distinguishing Between Depraved Mind Murder, Second Degree Murder, Involuntary Manslaughter, and Noncriminal Homicide in New Mexico*, 20 N.M. L. Rev. 55, 61-69 (1990) (identifying potential distinctions between depraved mind murder and second-degree murder and discussing the efforts of New Mexico courts to differentiate between the two).

**{19}** This Court first grappled with this thorny distinction in *State v. McCrary*, which was decided more than a decade prior to *Brown*. *McCrary*, 1984-NMSC-005, 100 N.M. 671, 675 P.2d 120. In *McCrary* we determined that first-degree depraved mind murder required proof of the defendant's subjective knowledge that his or her act was greatly dangerous to the lives of others. *Id.* ¶¶ 8-10. We relied on the committee commentary to the uniform jury instruction on first-degree depraved mind murder which existed at that time, which asserted that second-degree murder required an objective test of a defendant's knowledge, presumably implying that a "should have known" standard would satisfy the mens rea requirement for second-degree murder. *Id.* ¶ 8, referring to NMSA 1978, UJI Crim. 2.05, committee commentary (Repl. Pamp. 1982).

**{20}** However, the committee commentary to a jury instruction is only persuasive to the extent that it correctly states the law. *See State v. Johnson*, 2001-NMSC-001, ¶ 16, 130 N.M. 6, 15 P.3d 1233 (disapproving of a uniform jury instruction and its commentary because it was a "misstatement of [the] law"), *holding limited on other grounds by State v. Sims*, 2010-NMSC-027, ¶¶ 31-32, 148 N.M. 330, 236 P.2d 642. The passage in the commentary relied on by the *McCrary* Court is "doubtful authority" that objective knowledge is sufficient for second-degree murder. Romero, *supra*, at 65; *see* UJI Crim. 2.05, committee commentary (Repl. Pamp. 1982) (citing Wayne R. LaFave & Austin W. Scott, *Handbook On Criminal Law* 544 (1972)). As Professor Romero has noted, it appears that the drafters of the committee commentary "lifted a sentence out of context and mistakenly assumed that the treatise supports an objective standard for second degree murder." Romero, *supra*, at 65-67. Instead, the quoted portion of LaFave and Scott states that under first-degree depraved mind murder, it is "unusual" that a defendant's subjective realization of the risk will be at issue, and argues that attendant circumstances known to a

7

reasonable person will often be sufficient to establish that the defendant knew that his or her acts were greatly dangerous to the lives of others. *Id.*; *see also* UJI Crim. 2.05, committee commentary (quoting LaFave & Scott at 544). Indeed, in the next paragraph the treatise argues that a subjective realization of the risk should be required to convict for any degree of murder due to the drastic penal consequences of a murder conviction. LaFave & Scott, *supra*, at 544.

**{21}** To further confuse matters, a little over a year after *McCrary* was decided, we held in *State v. Beach* that second-degree murder contained a specific "element of subjective knowledge." 1985-NMSC-043, ¶ 12, 102 N.M. 642, 699 P.2d 115. *Beach* was later overruled in *Brown* "[t]o the extent that . . . *Beach* . . . holds that second-degree murder contains the same 'subjective knowledge' element as [first-degree] depraved mind murder." *Brown*, 1996-NMSC-073, ¶ 16.

**{22}** The *Brown* Court overruled *Beach* in dicta, which likely explains why since *Brown* was decided, neither our case law nor our uniform jury instructions have applied the *Brown* dicta to second-degree murder cases. *But cf. State v. Reed*, 2005-NMSC-031, ¶ 81, 138 N.M. 365, 120 P.3d 447 (Serna, J., concurring in part and dissenting in part) (advocating for a "should have known" standard to be incorporated into the uniform jury instruction for second-degree murder based on *Brown* in a case discussing first-degree depraved mind murder); *State v. Baca*, 1997-NMSC-059, ¶ 35, 124 N.M. 333, 950 P.2d 776 (referring to the objective test for second-degree murder in analyzing an ineffective assistance of counsel claim in the context of a conviction for aiding and abetting first-degree depraved mind murder). *Reed* clarified that first-degree depraved mind murder can be differentiated from second-degree murder because depraved mind murder requires a jury finding that the defendant's act "indicated a depraved mind without regard for human life." 2005-NMSC-031, ¶ 21. We laid out several indicators of a depraved mind in *Reed*, including (1) the number of persons subjected to the risk, (2) subjective knowledge that the defendant's act was greatly dangerous to human life, and (3) an element of "intensified malice or evil intent." *Id.* ¶¶ 22-24 (internal quotation marks and citation omitted). Notably, the majority opinion in *Reed* did not adopt the subjective-objective dichotomy urged by the dissent in that case and the *Brown* dicta. *See Reed*, 2005-NMSC-031, ¶ 81 (Serna, J., concurring in part and dissenting in part). However, the *Reed* majority stayed true to *Brown* by clarifying how the knowledge standard for first-degree depraved mind murder was distinct from the knowledge standard for second-degree murder. *Reed*, 2005-NMSC-031, ¶ 21; *see Brown*, 1996-NMSC-073, ¶ 16. The uniform jury instructions have since been revised to elaborate upon the meaning of a "depraved mind" and further distinguish first-degree depraved mind murder from second-degree murder; however, the second-degree murder instruction has never been revised to incorporate an objective "should have known" knowledge standard. *See* UJI 14-203, 14-210 to -213 NMRA.

**{23}** This Court's hesitancy to adopt the mens rea for second-degree murder advocated by the *Brown* dicta is commensurate with our consistent statements that a negligent or accidental killing could not satisfy the elements of second-degree murder. *See, e.g.*, *State*

8

*v. Ortega*, 1991-NMSC-084, ¶ 25, 112 N.M. 554, 817 P.2d 1196 (holding that an "unintentional or accidental killing will not suffice" to establish the mens rea element of second-degree murder), *abrogation recognized on other grounds by State v. Marquez*, 2016-NMSC-025, ¶ 14, 376 P.3d 815; *State v. Campos*, 1996-NMSC-043, ¶ 18, 122 N.M. 148, 921 P.2d 1266 ("[A] negligent or accidental killing would not constitute second-degree murder . . . ."); *see also State v. McGruder*, 1997-NMSC-023, ¶ 21, 123 N.M. 302, 940 P.2d 150 (same), *abrogated on other grounds by State v. Chavez*, 2009-NMSC-035, ¶ 26, 146 N.M. 434, 211 P.3d 891. Our longstanding refusal to endorse a theory of negligent murder forecloses the implication in *Brown* that to convict of second-degree murder it would be sufficient for the jury to find that a defendant should have known of the risk of his or her conduct without anything more, because that is essentially a civil negligence standard. *See State v. Consaul*, 2014-NMSC-030, ¶ 39, 332 P.3d 850 (noting the close association between the phrase "knew or should have known" and principles of civil negligence (internal quotation marks omitted)); *see also* Romero, *supra*, at 65 ("To say that a person should have known of the risk imposes a negligence standard based on an objective test of what the reasonable person would have known under the circumstances."). Indeed, it is a "concept firmly rooted in our jurisprudence [that w]hen a crime is punishable as a felony, civil negligence ordinarily is an inappropriate predicate by which to define such criminal conduct" in the absence of some contrary indication from the Legislature. *Santillanes v. State*, 1993-NMSC-012, ¶¶ 30-31, 115 N.M. 215, 849 P.2d 358.

**{24}** Further, if we were to adopt a "should have known" standard for second-degree murder, we would render inconsistent the culpability requirements under New Mexico's various homicide statutes. For example, the lesser offense of involuntary manslaughter requires that a defendant have acted "without due caution and circumspection." NMSA 1978, § 30-2-3(B) (1994). In *State v. Yarborough*, we clarified that "the State must show at least criminal negligence to convict . . . of involuntary manslaughter." 1996-NMSC-068, ¶ 20, 122 N.M. 596, 930 P.2d 131. The uniform jury instruction for involuntary manslaughter requires proof that a defendant "should have known of the danger involved" in his or her actions and also "acted with a willful disregard for the safety of others." UJI 14-231 NMRA. It would be incongruent to interpret our second-degree murder statute to require a less culpable mental state (ordinary negligence) than the minimum level of culpability required by involuntary manslaughter (criminal negligence). *See State v. Nick R.*, 2009-NMSC-050, ¶ 11, 147 N.M. 182, 218 P.3d 868 ("We must take care to avoid adoption of a construction that would render the statute's application absurd or unreasonable or lead to injustice or contradiction." (internal quotation marks and citation omitted)).

**{25}** We detect no ambiguity in Section 30-2-1(B) that would require us to interpret the knowledge requirement to extend to situations where a defendant did not know of the risk created by his or her act, but instead merely should have known of that risk. Despite some confusing language in our case law regarding first-degree depraved mind murder, we have never incorporated an objective "should have known" standard into our cases analyzing second-degree murder, or otherwise implied that ordinary negligence could be a sufficiently culpable mental state to support any kind of murder conviction. Our uniform jury

9

instructions, to which the State's tendered instruction added a "should have known" component, have also never incorporated an ordinary negligence standard for second-degree murder. Accordingly, the instruction in this case misstated the mens rea element of second-degree murder, and it was therefore error for the district court to provide this instruction to the jury.[2]

## C.     The district court's misstatement of the essential mens rea element is reversible error requiring a new trial

**{26}**     "[I]f an instruction is facially erroneous it presents an incurable problem and mandates reversal." *State v. Parish*, 1994-NMSC-073, ¶ 4, 118 N.M. 39, 878 P.2d 988; *see also State v. Ellis*, 2008-NMSC-032, ¶ 14, 144 N.M. 253, 186 P.3d 245 ("A jury instruction which does not instruct the jury upon all questions of law essential for a conviction of any crime submitted to the jury is reversible error." (internal quotation marks and citations omitted)).

**{27}**     Our rules require lawyers to object to erroneous instructions, as defense counsel did in this case. Rule 5-608(D). The purpose of this requirement is to alert the trial court to the problem with the instruction and to allow the court an opportunity to correct the error. *Id.* In this case, a uniform jury instruction has been available for second-degree murder since 1981. NMSA 1978, UJI Crim. 2.10 (1981) ("Second Degree Murder: voluntary manslaughter lesser included offense; essential elements"); UJI Crim. 2.11 (1981) ("Second Degree Murder: voluntary manslaughter not lesser included offense; essential elements"). "[W]hen a uniform instruction is provided for the elements of a crime, . . . the uniform instruction should be used without substantive modification . . . [unless] alteration is adequately supported by binding precedent . . . and where the alteration is necessary in order to accurately convey the law to the jury." Uniform Jury Instructions—Criminal, Contents, General Use Note (2015). For the essential elements of crimes not contained in a uniform jury instruction, the court must draft an instruction, and ordinarily that instruction is adequate if it substantially follows the language of the statute. *See State v. Doe*, 1983-NMSC-096, ¶ 8, 100 N.M. 481, 672 P.2d 654 ("[I]f the jury instructions substantially follow the language of the statute or use equivalent language, then they are sufficient."), *holding modified by Beach*, 1985-NMSC-043, ¶ 12. The modification of the uniform jury instruction in this case was not supported by binding precedent, and it neither accurately conveyed the law to the jury nor substantially followed the language of Section 30-2-1(B). This was not a case where the mens rea element was not at issue or where the evidence was undisputed and indisputable. Instructing the jury with a non-uniform jury instruction compromised Suazo's "fundamental right . . . to have the jury determine whether each element of the charged offense has been proved by the state beyond a reasonable doubt," and it was

---

[2]We note that the current committee commentary to UJI 14-203 states that second-degree murder requires proof of objective knowledge, citing *Reed* and *Brown*. The committee should revisit this commentary in light of our opinion in this case.

10

therefore reversible error. *Cabezuela*, 2011-NMSC-041, ¶ 39 (internal quotation marks and citations omitted).

**{28}** The State argues that we should not reverse because the jury found beyond a reasonable doubt that Suazo "intended to injure Roger Gage or another," which the State contends no reasonable juror would have found while also finding that Suazo did not know of the strong probability of death or great bodily harm to Vigil. Indeed, in a prior case we held that a failure to instruct on an essential element of an offense does not warrant reversal under a reversible error standard "[w]hen there can be no dispute that the essential element was established." *Santillanes*, 1993-NMSC-012, ¶ 32 (concluding that in conducting its analysis, a court must consider whether there is some evidence, no matter how slight, or a reasonable inference from such evidence, that proves the element in issue) (citing *Orosco*, 1992-NMSC-006, ¶¶ 10-12)).

**{29}** In *Santillanes* we upheld the defendant's conviction for child abuse under a reversible error standard despite a jury instruction erroneously requiring the jurors to find a civil negligence mens rea rather than the requisite statutory mens rea of criminal negligence. 1993-NMSC-012, ¶¶ 32-34. In that case, the defendant was accused of cutting his seven-year-old nephew's throat with a knife during a scuffle, but he claimed that his nephew had injured himself by jumping into a fishing line strung between two trees, and notably did not argue that he had inadvertently caused the boy's throat to be cut. *Id.* ¶¶ 2, 33. The contested issue was whether the defendant cut his nephew's throat, not whether he cut his nephew's throat with criminal or civil negligence. We relied on the jury's finding that the defendant had cut his nephew's throat with a knife, and concluded that under those facts "no rational jury" could have determined that the nephew's throat had been cut "without satisfying the standard of criminal negligence" that should have been applied in that case. *Id.* ¶ 34. Put another way, the element at issue in *Santillanes* was whether the defendant had committed a specific act, not his mens rea. Thus, the jury's finding beyond a reasonable doubt that the defendant cut his nephew's throat with a knife was also necessarily a finding beyond a reasonable doubt that the defendant acted with at least a mental state of criminal negligence in so doing.

**{30}** According to the dissent and the State, we should view this case similarly because the jury found beyond a reasonable doubt that Suazo intended to injure Gage or another by shooting a shotgun in Vigil's mouth, which the State contends was effectively a finding beyond a reasonable doubt that Suazo knew the gun was loaded and that shooting it would create a strong probability of death or great bodily harm to Vigil. That Suazo pulled the trigger of the shotgun was not at issue in the case. Instead, the issue was whether he pulled the trigger of a shotgun that he knew was loaded. Therefore, unlike in *Santillanes*, where the instructional error related to what was essentially an uncontested issue, the mens rea element was a central aspect of this case. We cannot say with certainty whether the jury found that Suazo knew the shotgun was loaded, or whether jurors merely found that he should have known because a simple inspection of the shotgun would have revealed whether it was loaded. The latter finding cannot support a second-degree murder conviction because,

11

as we have previously discussed, mere negligence is not enough to prove second-degree murder. The misstatement of the mens rea element misdirected the jury, potentially allowing the jurors to convict Suazo based upon a finding that could not support a second-degree murder conviction under the appropriate legal standard.

{31}   It is tempting to agree with the dissent and the State that the intent to injure element of aggravated battery satisfies the mens rea requirement for second-degree murder because New Mexico criminalizes intent-to-injure battery, *see State v. Vasquez*, 1971-NMCA-182, ¶ 12, 83 N.M. 388, 492 P.2d 1005 (recognizing that aggravated battery requires proof of an intent to injure).  If a jury finds that a defendant intended to injure a person by pulling the trigger of a firearm, it is reasonable to conclude that the jury found that the defendant knew that the firearm was loaded, that it would discharge, and that pulling the trigger created a strong probability of great bodily harm or death.  Alternatively, if the jury was misled into believing that the intent to injure element of aggravated battery is satisfied if the jury finds that the defendant should have known that pulling the trigger created a strong probability of great bodily harm or death, then it cannot be indisputable that the jury found that the defendant knew the firearm was loaded and would discharge.  The latter situation is what occurred in this case.  When discussing the instruction for aggravated battery, the prosecutor told the jurors,

> If you believe that [Suazo] committed second-degree murder, and that he *knew or should have known* that his actions created great bodily harm or death, towards Matthew Vigil, injuring Matthew Vigil, and as a result he injures Roger Gage, that's transferred intent.  That's where we get to that element on Roger Gage.

(Emphasis added.)  Thus, not only did the prosecution—perhaps negligently— mislead the district court into issuing an erroneous instruction, the prosecution also misled the jury into believing that the erroneous mens rea element for second-degree murder—negligence—was sufficient to support a finding of aggravated battery.  We need not decide whether New Mexico recognizes the crime of criminal-negligence battery because in this case the prosecution did not try to make a case for criminal-negligence battery; instead, the prosecution argued a case for negligence battery.  The prosecution's errant statement to the jury further undermines the State's premise that the jurors must have believed that Suazo knew that the gun was loaded to convict him of aggravated battery against Gage.  Despite the State's contentions in this case, the jury's intent finding under aggravated battery is simply not enough for us to say with certainty that the jury necessarily found a different, and highly contested, mens rea for the offense of second-degree murder.[3]

---

[3]Although we cannot state with certainty how the jurors deliberated with respect to each offense, there is at least a possibility that the jurors first considered the second-degree murder charge, and determined Suazo's guilt prior to considering the battery charge. Therefore, the erroneous instruction may have influenced their thinking with respect to

12

**{32}**     Having concluded that the error in this case mandates reversal, to avoid double jeopardy concerns, we must examine whether sufficient evidence in this case supports retrying Suazo. *Dowling*, 2011-NMSC-016, ¶ 18. Under a sufficiency of the evidence test, we view the evidence in the light most favorable to the verdict and draw all inferences in favor of the verdict to determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Samora*, 2016-NMSC-031, ¶ 34, ___ P.3d ___ (internal quotation marks and citations omitted). In this case, to retry Suazo for second-degree murder with manslaughter as a lesser-included offense, substantial evidence must exist to support the following elements: (1) Suazo killed Vigil, (2) Suazo knew that his acts created a strong probability of death or great bodily harm to Vigil or any other human being, (3) Suazo did not act as a result of sufficient provocation, and (4) this happened in New Mexico. Section 30-2-1(B); UJI 14-210. The first and fourth elements were undisputed in this case, so the only issue is whether the mens rea and lack of sufficient provocation components of the State's case were met.

**{33}**     Viewing the evidence in the light most favorable to a guilty verdict, we conclude that there was sufficient evidence to support a reasonable jury's conclusion that the mens rea and lack of sufficient provocation elements were met in this case. First, the jury could have reasonably inferred from Suazo's statements, the ambiguous evidence regarding who loaded the gun and when it was loaded, and the steps Suazo took after the crime to conceal evidence, that Suazo knew the gun was loaded and knew that pulling the trigger would cause great bodily harm or death to Vigil. Second, the jurors could have reasonably concluded that the roughhousing between Suazo and Vigil, an activity in which they frequently engaged and had been engaged in throughout that day, was not enough to constitute sufficient provocation to reduce the crime to manslaughter. *See* UJI 14-222 NMRA (" 'Sufficient provocation' can be any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions. The provocation must be such as would affect the ability to reason and to cause a temporary loss of self control in an ordinary person of average disposition. The 'provocation' is not sufficient if an ordinary person would have cooled off before acting.").

## III.     CONCLUSION

**{34}**     Suazo's evidentiary arguments lack merit. The second-degree murder instruction misstated the mens rea element for second-degree murder, and it therefore requires reversal. We reverse Suazo's conviction for second-degree murder and remand for a new trial.

**{35}     IT IS SO ORDERED.**

---

battery. After all, once the jurors concluded that Suazo committed second-degree murder, how could they not convict him of the lesser offense of injuring Gage with the same shot?

13

_____

**EDWARD L. CHÁVEZ,  Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**BARBARA J. VIGIL, Justice**

**JUDITH K. NAKAMURA, Justice, concurring in part and dissenting in part**

**NAKAMURA, Justice (concurring in part; dissenting in part)**.

**{36}**    This case is destined for the criminal law treatises.  A shoots C.  B is standing between A and C.  In order for A to shoot C, A must fire through B's head.  If we accept these facts as true, what must A have known were the likely consequences for B of A's shooting C?  There can be only one conclusion: A must have known that there was a strong probability B would die.  These, of course, are the facts of this case.

**{37}**    Suazo pointed the shotgun at Vigil, and Vigil inexplicably placed the barrel of the shotgun into his mouth.  Gage was standing behind Vigil.  When Suazo pulled the trigger and fired the shotgun, the shotgun pellets exploded from the cartridge, fired out of the barrel of the shotgun, traveled into Vigil's mouth, passed through Vigil's head killing him, and entered Gage's body causing Gage serious injuries.  For perpetrating this act against Gage, Suazo was convicted of aggravated battery with a deadly weapon.  Suazo did not challenge the propriety of either the aggravated-battery instruction or his conviction for aggravated battery.

**{38}**    At trial, the jury was instructed that

> For you to find [Suazo] guilty of aggravated battery with a deadly weapon . . . the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.    [Suazo] touched or applied force to Roger Gage by shooting at him with a firearm.
>
> [Suazo] used a 12 gauge shotgun.

14

2.    [Suazo] intended to injure Roger Gage or another;

3.    This happened in New Mexico on or about the 21st day of May, 2013.

This instruction mirrors the uniform instruction. *See* UJI 14-322 NMRA.

**{39}**    Aggravated battery is a specific intent crime. *State v. Crespin*, 1974-NMCA-104, ¶ 8, 86 N.M. 689, 526 P.2d 1282. "Specific intent to injure a person is an essential element of the crime. The state must prove beyond a reasonable doubt that the defendant knowingly committed an aggravated battery, purposely intending to violate the law." *Id.* (citation omitted). A firearm is a deadly weapon. NMSA 1978, § 30-1-12(B) (1963) ("'deadly weapon' means any firearm . . . ."). When, as in this case, aggravated battery is committed with a deadly weapon, the jury need not be instructed that the weapon used was likely to cause death or great bodily harm. *See State v. Murillo*, 2015-NMCA-046, ¶ 21, 347 P.3d 284 (explaining that the jury need not find that a switchblade could cause death or great bodily harm because a switchblade is per se a deadly weapon). Deadly weapons necessarily inflict great bodily harm or fatal wounds.

**{40}**    I agree with the majority that the instruction submitted to Suazo's jury on second-degree murder was incorrect. Maj. Op. ¶ 25. But we have previously recognized that requiring reversal in every circumstance where a jury is misinstructed would not only be unwise but would lead to undesirable results. *See State v. Orosco*, 1992-NMSC-006, ¶ 13, 113 N.M. 780, 833 P.2d 1146 ("Applying a rule of automatic reversal is not required by the relevant constitutional principles and fails to take into account our role as an appellate tribunal."). Accordingly, we have held that, even where a jury is misinstructed, the conviction may be affirmed so long as the omitted or misstated element was properly and indisputably established. *Id.* ¶ 12; *see also Santillanes v. State*, 1993-NMSC-012, ¶ 32, 115 N.M. 215, 849 P.2d 358.

**{41}**    The jury's decision to convict Suazo of aggravated battery against Gage indisputably establishes that the jury must also have found that Suazo acted with the required mens rea for second-degree murder. Suazo necessarily knew that, if he committed aggravated battery against Gage with the shotgun, then Vigil would almost certainly die. This must be true because, in order to commit aggravated battery against Gage, Suazo had to fire the shotgun into Vigil's mouth and through his head. Because Suazo necessarily acted with the mens rea required to convict him of second degree murder, the error in the second-degree murder instruction was not reversible. *Santillanes* does not compel a different result.

**{42}**    In *Santillanes*, the jury was misinstructed on the mens rea requirement for child abuse, *id.* ¶¶ 29, 32, but we concluded that the error was not reversible. *Id.* ¶ 34. We noted that "the defendant cut his nephew's throat with a knife" from "just below his right ear across to the left side of his neck below his jaw," and that the jury found the defendant cut the boy during a scuffle. *Id.* ¶¶ 33-34. We concluded that "no rational jury" could have

15

concluded that the defendant perpetrated these acts without also necessarily concluding that the defendant acted with criminal negligence, the mens rea requirement that the state was required to establish. *Id.*

**{43}** As the majority observes, Maj. op. ¶ 29, we expressly noted in *Santillanes* that the defendant "did not argue that he inadvertently caused the boy's throat to be cut." 1993-NMSC-012, ¶ 33. According to the majority, this indicates that the mens rea element of the offense for which the defendant in *Santillanes* was convicted was not contested. Maj. op. ¶¶ 29-30. By contrast, Suazo maintained at trial that he did not know the gun he fired into Vigil's mouth and through his head was loaded, which was an attempt to show he did not possess the necessary mens rea for second-degree murder. For the majority, this distinction is crucial. *Id.* ¶ 29. The majority contends that Suazo's trial theory sufficiently distinguishes his case from *Santillanes* and precludes this Court from resolving "whether the jury found that Suazo knew the shotgun was loaded, or whether jurors merely found that he should have known because a simple inspection of the shotgun would have revealed whether it was loaded." *Id.* ¶ 30. I do not concur.

**{44}** Unlike in *Santillanes*, Suazo was convicted of multiple offenses. Suazo's jury was correctly instructed that it had to find that the aggravated battery was intentionally committed, and it so found. Therefore, the jury necessarily rejected Suazo's theory of the case. Only one shot was fired; it killed Vigil and grievously injured Gage. That single shot could not be both intentional and accidental. Thus, if Suazo intentionally fired the shot which injured Gage, he could not have accidentally shot Vigil. Because Suazo's jury found that Suazo intentionally fired the shot that injured Gage, the jury necessarily rejected Suazo's claim that he accidentally killed Vigil.

**{45}** Lastly, I see no reason to conclude that the erroneous second-degree murder instruction somehow infected the jury's deliberation with respect to aggravated battery. Maj op. ¶ 31 n.3. The district court properly instructed the jury on aggravated battery. *See State v. Privett*, 1986-NMSC-025, ¶ 9, 104 N.M. 79, 717 P.2d 55 (instructing district courts to use uniform instructions when they exist). "The jury is presumed to follow the court's instructions." *State v. Gonzales*, 1992-NMSC-003, ¶ 35, 113 N.M. 221, 824 P.2d 1023, *overruled on other grounds by State v. Montoya*, 2013-NMSC-020, 306 P.3d 426. And as noted, Suazo did not challenge the propriety of the aggravated-battery instruction or his conviction for that offense. Nor am I persuaded that the prosecution's statement about transferred intent misled the jury. Maj op. ¶ 31. Suazo did not object to the prosecutor's statement and the issue was not argued on appeal. Moreover, instruction number one informed Suazo's jury that "[t]he law governing this case is contained in instructions that I am about to give you. It is your duty to follow the law as contained in these instructions." If misdirection occurred, it was cured by proper instructions.

**{46}** For the reasons set out above, I would affirm Suazo's second-degree murder conviction. I concur that the district court did not abuse its discretion in excluding the statements Suazo made after the shooting.

_____

**JUDITH K. NAKAMURA,  Justice**