This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-40208

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**MATHEW VARGAS,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF McKINLEY COUNTY**
**Robert A. Aragon, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Van Snow, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Caitlin C.M. Smith, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**BOGARDUS, Judge.**

**{1}** Defendant Mathew Vargas appeals his conviction for vehicular homicide (driving under the influence), contrary to NMSA 1978, Section 66-8-101(C) (2016). Defendant

argues that fundamental error occurred because the causation instruction tendered to the jury affirmatively misstated the law. We agree and reverse Defendant's conviction.[1]

## BACKGROUND

{2}     After attending a friend's wedding in Red Rock State Park outside of Gallup, New Mexico, Defendant began driving back home westbound toward Gallup on Route 66, a two-lane highway and was involved in a head-on collision, which resulted in the death of the other driver. A number of drivers witnessed the car accident. Marlin and Jennifer Simplicio, also driving westbound on Route 66, testified that they saw Defendant's vehicle steer into the eastbound lane to pass the car in front of him, and when he did, Defendant hit the victim's truck, which was traveling eastbound. Shakiva and Orlando John, who were driving in the eastbound lane, stated that they also saw Defendant's vehicle swerve into the eastbound lane and hit the victim's truck.

{3}     As a result of the accident, the victim died at the scene and Defendant was seriously injured—the emergency brake from Defendant's vehicle was embedded in his leg, trapping him inside. The emergency medical technician (EMT) that tended to Defendant, testified that Defendant did not seem "altered in any way" and that he could answer basic questions about who he was and how he came to be at the scene of the accident. The EMT further noted that Defendant did not slur his speech, did not smell like alcohol, and did not seem intoxicated. However, according to the EMT, Defendant seemed "lethargic."

{4}     At the scene, the EMT also found a baggie containing one and a half Xanax pills in Defendant's pocket. Defendant told the EMT that the Xanax pills were his and that he took them as needed for anxiety. When interviewed by police after the accident, Defendant denied taking Xanax on the day of the accident. He admitted that he did not have a current prescription for Xanax, although he claimed a doctor had prescribed it for him in the past. According to Defendant, he got the Xanax pills from a friend who gave them to him after he suffered from an anxiety attack. Defendant testified he had last taken a Xanax pill two days before the accident.

{5}     Defendant was transported to the hospital, where hospital staff drew his blood— approximately seven to eight hours after the accident. Defendant had a concentration of 0.04 milligram per liter of alprazolam, the generic name for Xanax, in his system. Several days after the accident, Defendant was interviewed by detectives. During the interview, Defendant stated that he remembered the victim swerving into his lane. Defendant claimed he saw the victim briefly come into his lane and when he looked down to adjust the air conditioning in his vehicle and looked back up, the victim's truck was about to hit him. At trial, the State presented evidence from three experts in accident reconstruction who all testified that the accident occurred in the victim's lane— the eastbound lane of the highway. Defendant conceded that the evidence showed that

---

[1]Defendant also argues that he was erroneously sentenced for a second-degree felony resulting in death, which carries a heavier sentence, rather than just a second-degree felony. Because we reverse on fundamental error grounds, we do not reach the sentencing issue.

the impact probably happened in the victim's lane. The jury convicted Defendant of vehicular homicide by driving under the influence.

## DISCUSSION

**{6}** Defendant argues that fundamental error occurred because the jury received an instruction on the definition of causation that essentially "told the jury it could convict if it found that [his] driving was the proximate cause of [the victim's] death," instead of making clear that the jury had to find that Defendant's unlawful conduct, driving under the influence, was the proximate cause of death. Specifically, Defendant contends that the dispute at trial was "whether [Defendant] was *criminally* responsible for [the victim's] death," not whether Defendant's driving killed the victim. Because the causation instruction misstated the proximate cause requirement, Defendant asserts that the jury "could have convicted him without finding beyond a reasonable doubt that an unlawful act was the proximate cause of [the victim's] death." The State responds that even if the causation instruction was erroneous, any error was not fundamental.

## I. Standard of Review

**{7}** We review Defendant's argument for fundamental error because he failed to preserve this issue at trial. *See State v. Cunningham*, 2000-NMSC-009, ¶ 10, 128 N.M. 711, 998 P.2d 176 (stating "[t]he doctrine of fundamental error, embodied in Rule 12-216(B)(2) [NMRA], is an exception to the general rule requiring preservation of error"). We are mindful that "the fundamental error doctrine requires an appellate court to perform a difficult and often high-stakes inquiry." *State v. Sivils*, 2023-NMCA-080, ¶ 9, 538 P.3d 126.

**{8}** Fundamental error exists, in a particular case, if it would "shock the conscience" to affirm the conviction. *See State v. Barber*, 2004-NMSC-019, ¶ 14, 135 N.M. 621, 92 P.3d 633. An error can "shock the conscience" in one of two ways, either: (1) because of "the obvious innocence of the defendant," *id.* ¶ 16, or (2) because "a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *Id.* ¶ 17. Here, we are concerned with the latter—the procedural strand of the fundamental error doctrine. The procedural strand "focuses less on guilt and innocence and more on the process and the underlying integrity of our judicial system." *Id.* ¶ 16. "[N]ot all questions of fundamental error turn solely on guilt or innocence . . . [o]ur inquiry must probe deeper." *Id.* ¶ 14.

## II. The Causation Instruction Was Erroneous

**{9}** First, we must determine whether an error occurred and in so doing we ask "whether a reasonable juror would have been confused or misdirected by the jury instruction" at issue. *Id.* ¶ 19. A jury instruction may cause confusion or misdirection when, "through omission or misstatement," it does not provide "an accurate rendition" of the relevant law. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. Because the causation instruction "fail[ed] to provide the juror[s] with an accurate

rendition of the relevant law," *See State v. Cabezuela*, 2011-NMSC-041, ¶ 22, 150 N.M. 654, 265 P.3d 705 (internal quotation marks and citation omitted), we conclude that it was erroneous. In reaching this conclusion we interpret the causation element of our vehicular homicide statute. "Our primary goal when interpreting a statute is to determine and give effect to the Legislature's intent." *State v. Suazo*, 2017-NMSC-011, ¶ 15, 390 P.3d 674 (internal quotation marks and citation omitted).

**{10}** We begin with the plain language of the statute, which is "[t]he primary indicator of legislative intent." *State v. Johnson*, 2009-NMSC-049, ¶ 10, 147 N.M. 177, 218 P.3d 863. Pursuant to Section 66-8-101(C), "[a] person who commits homicide by vehicle while under the influence of intoxicating liquor or while under the influence of any drug is guilty of a second[-]degree felony." Our Supreme Court has adopted a Uniform Jury Instruction (UJI)—UJI 14-240B NMRA regarding the violation. An instruction conforming with UJI 14-240B was provided to the jury. The instruction required the jury to find, beyond a reasonable doubt:

1.  [D]efendant operated a motor vehicle while under the influence of alprazolam also referred to as [X]anax, a drug;

2.  [D]efendant's driving while under the influence of drugs caused the death of [the victim]; [and]

3.  This happened in New Mexico on or about the 14th day of October, 2017.

Based on both the plain language of Section 66-8-101 and the elements instruction, the jury was required to find *both* that Defendant engaged in an unlawful activity (driving under the influence of Xanax) and that such unlawful activity (driving under the influence of Xanax) *caused* the death of the victim. *See* § 66-8-101(C).

**{11}** The definition of "causation" was of central importance to Defendant's right to a fair trial, *see Barber*, 2004-NMSC-019, ¶ 25, because Defendant's theory of the case directly controverted the State's theory that his act of driving under the influence was the cause of the victim's death. Because Defendant raised a question as to whether impairment, i.e., his use of Xanax, was actually the cause of the victim's Death, causation was clearly in issue. Significantly, throughout trial and on appeal, Defendant contested the State's theory that he acted unlawfully, and that the alleged unlawful activity caused the victim's death. According to Defendant, he "drifted out of his lane accidentally when he looked down to change the air settings in [his vehicle]." Specifically, Defendant claims that he reached down to adjust the air, looked up, and crashed. Defendant testified that when he left the wedding reception he felt "perfectly fine" and was not under the influence of anything. In other words, he contended that a moment of inattention was the cause of the accident, and not intoxication. Defendant also contended that driver negligence is not a crime and would not support a conviction for homicide by vehicle.

**{12}** When causation is in issue, as it was here, the use note to UJI 14-240B requires that the definition of causation be provided to the jury. *See* UJI 14-240B use note 6 (stating that "[i]f causation is in issue UJI 14-251 NMRA, the definition of causation, must be given"); *see also* UJI 14-240C NMRA use note 4 (stating that "[i]f causation is in issue, UJI 14-251 . . . , the definition of causation, must be given"). The jury was given a causation instruction modeled after UJI 14-251, and it is this instruction that forms the basis of Defendant's claim of error. The causation instruction asked the jury to find beyond a reasonable doubt that

1.      [t]he death was a foreseeable result of [D]efendant's driving; [and]

2.      [t]he act of [D]efendant was a significant cause of the death of [the victim].

Use note 3 for UJI-14-251 directs the court to "[d]escribe the act alleged to be the cause of death," however, the causation instruction listed the cause of death as "[D]efendant's driving" rather than as the charged unlawful activity—Defendant's alleged act of driving under the influence.

**{13}** Due to the misstatement of the instruction defining causation as an element of 66-8-101(C), the jury was instructed that it could find Defendant guilty of homicide by vehicle if it found that Defendant's *driving* caused the victim's death. The purpose of the vehicular homicide statute is not to punish all driving that results in death—rather its purpose is "to punish reckless driving or impaired driving when such conduct results in death or great bodily injury." *State v. Munoz*, 1998-NMSC-041, ¶ 20, 126 N.M. 371, 970 P.2d 143. "When causation is contested in a vehicular homicide case, the state must prove beyond a reasonable doubt that the defendant's unlawful actions caused the death in a natural and continuous chain of events." *State v. Ruffin*, 2019-NMCA-009, ¶ 15, 458 P.3d 445 (alteration, internal quotation marks, and citation omitted). Accordingly, the causation instruction is erroneous because it "fail[ed] to provide the juror[s] with an accurate rendition of [proximate causation]." *See Cabezuela*, 2011-NMSC-041, ¶ 21 (internal quotation marks and citation omitted). Because the causation instruction "directs the jury to find guilt based upon a misstatement of the law, a finding of juror misdirection is unavoidable." *State v. Dowling*, 2011-NMSC-016, ¶ 17, 150 N.M. 110, 257 P.3d 930.

## III.     The Error in the Causation Instruction Was Fundamental

**{14}** We now determine whether the error is fundamental. *See State v. Ocon*, 2021-NMCA-032, ¶ 8, 493 P.3d 448. As is evident by the parties' briefing, there is no bright-line rule that is determinative as to when an erroneous definitional instruction amounts to fundamental error. *See State v. Mascareñas*, 2000-NMSC-017, ¶ 20, 129 N.M. 230, 4 P.3d 1221 (concluding that the trial court's failure to provide a definition "was a critical determination akin to a missing elements instruction" because causation was in issue); *see also Barber*, 2004-NMSC-019, ¶¶ 26-32 (concluding that the trial court's failure to provide a definition did not implicate a critical determination akin to a missing elements

instruction because "the third element of the jury instruction . . . subsume[d] a finding on" the missing element). However, it is clear that "[w]hile most definitional instructions merely amplify an element instruction, a few . . . can be of central importance to a fair trial." *Barber*, 2004-NMSC-019, ¶ 25. Accordingly, we must place the erroneous jury instruction "in the context of the individual facts and circumstances of the case, to determine whether . . . Defendant's conviction was the result of a plain miscarriage of justice." *See id.* ¶ 19 (internal quotation marks and citation omitted). "If such a miscarriage exists, we deem it fundamental error." *State v. Anderson*, 2016-NMCA-007, ¶ 9, 364 P.3d 306.

**{15}**   The State argues that any error in the causation instruction is not fundamental because the jury instructions, read as a whole "leave no room" for Defendant's argument that the jury could have convicted Defendant on the basis of noncriminal conduct. Specifically, the State calls our attention to Instruction No. 17, defining driving "under the influence." The instruction states that "[a] person is under the influence of a drug when as a result of using a drug the person is incapable of safely driving a vehicle." Relying on this instruction, the State asserts that because "the jury found beyond a reasonable doubt that [Defendant] was incapable of operating his vehicle due to intoxication" it must have also found that "Defendant operated his [vehicle] while incapable of safely driving it due to the influence of Xanax and, by driving in that state, caused [the victim's] death." We disagree.

**{16}**   Reviewing the jury instructions as a whole, we find no other instructions that corrected the error in the causation instruction. The instruction that the State points to defining driving "under the influence" provides no guidance whatsoever about the specific meaning of the proximate causation element of vehicular homicide. *But see Cunningham*, 2000-NMSC-009, ¶¶ 14-22 (declining to reverse the defendant's conviction under fundamental error because although the jury instruction on deliberate-intent first-degree murder improperly omitted the element of unlawfulness, this omission was corrected by a proper self-defense instruction that pertained to the deliberate-intent first-degree murder charge). Vehicular homicide while driving under the influence (DUI) involves two elements: (1) driving under the influence; and (2) the act of driving under the influence must have caused the victim's death. Whether or not Defendant was "driving under the influence" may relate circumstantially to the causation element for vehicular homicide, but it is not conclusive, beyond a reasonable doubt, as to whether Defendant's act of driving under the influence actually *caused* the victim's death.

**{17}**   The effect of the erroneous instruction was exacerbated by Defendant's admission at trial that he accidentally veered into the victim's lane—causing the victim's death. Defendant's admission viewed in the light of the erroneous causation definition, creates a distinct possibility that the jury convicted Defendant because it found that his driving caused the victim's death—rather than basing its conviction on the correct applicable legal standard—i.e., that the unlawful activity must have been the legal cause of the victim's death. *See Mascareñas*, 2000-NMSC-017, ¶ 21 (stating "[t]here is simply no way to determine whether the jury delivered its verdict on a legally adequate basis").

**{18}** Lastly, we look to the evidence presented at trial concerning the connection between Defendant's act of driving under the influence and the resulting death of the victim. This is not a case where the evidence was so unchallenged that we can conclude that the jury must have found, beyond a reasonable doubt, that Defendant's driving under the influence caused the victim's death—rather the overwhelming majority of the evidence presented at trial concerned solely Defendant's impairment rather than his driving. *Compare Barber*, 2004-NMSC-019, ¶ 26 (concluding an erroneous instruction did not amount to fundamental error because "no distinct possibility exists from the evidence that the jury convicted [the d]efendant without finding all of the elements beyond a reasonable doubt"), *with Mascareñas*, 2000-NMSC-017, ¶ 15 (stating that because an erroneous definition given to the jury was also a disputed issue at trial, the court could not conclude that the defendant's actions satisfied the proper criminal negligence standard). Although the jury heard testimony that before the accident, Defendant's vehicle occasionally left its lane as if it was trying to pass the vehicle in front of it, one witness testified that Defendant's vehicle never attempted to pass any vehicle—it stayed consistently in its lane from the time Defendant left the wedding.

**{19}** There was significant testimony presented at trial that Defendant did not seem altered or impaired in any way on the day of the accident. John Lucero, a nurse who was on the helicopter that transported Defendant to the hospital, testified that he "would not describe [Defendant] as intoxicated." Tiana Montaño, Defendant's former fiancée, who testified that she had been with Defendant for the entire wedding reception prior to the accident, stated that she did not notice anything unusual about Defendant's balance or speech, describing him as "just normal." Additionally, the EMT that responded to the accident testified that Defendant "was not altered in any way." She further stated that Defendant "knew who he was, he knew where he was, he knew what happened" and that he did not seem intoxicated.

**{20}** Moreover, "[t]he State's experts disagreed on whether they could determine impairment from [Defendant's] blood sample." Dr. Pike, a medical toxicologist, testified that a person with the 0.04 milligrams of Xanax per liter of blood "would be impaired they would not be able to operate [a vehicle] safely." He further testified that at the time of the accident, Defendant's blood concentration was likely between 60 to 70 nanograms per milliliter (0.06 to 0.07 milligrams per liter), leading him to conclude that Defendant would have been impaired at the time of the accident. However, Dr. Kleinman, the State's other expert, testified that after his review of the facts of the case, he could not opine on Defendant's impairment based solely on the lab results taken eight hours after the accident.

**{21}** Having "review[ed] the entire record and "plac[ed] the jury instructions in the context of the individual facts and circumstances of the case, *see Barber*, 2004-NMSC-019, ¶ 19 (internal quotation marks and citation omitted), "[t]here is simply no way to determine that the jury delivered its verdict on a legally adequate basis." *See Mascareñas*, 2000-NMSC-017, ¶ 21. Thus, "[t]o allow [Defendant's] conviction to stand when there is a distinct possibility that he was convicted" for conduct that was not

unlawful within the meaning of Section 66-8-101(C) "would result in a miscarriage of justice and therefore we find that fundamental error occurred." *See id.* Under the specific facts and circumstances of this case, the erroneous instruction compromised Defendant's "fundamental right . . . to have the jury determine whether each element of the charged offense has been proven by the [S]tate beyond a reasonable doubt." *See Cabezuela*, 2011-NMSC-041, ¶ 39 (internal quotation marks and citation omitted); *see also State v. Herrera*, 2014-NMCA-007, ¶ 8, 315 P.3d 343 (explaining that the Sixth and Fourteenth Amendments to the United States Constitution "entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt" (internal quotations marks and citation omitted)). Thus, we conclude the error in the causation instruction was fundamental.

**CONCLUSION**

**{22}** We reverse Defendant's conviction and remand for a new trial.

**{23}  IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**JANE B. YOHALEM, Judge**