This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-35828**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**SERGIO CHAVEZ-AGUIRRE,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**George P. Eichwald, District Judge**

Hector H. Balderas, Attorney General
Marko D. Hananel, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**BOGARDUS, Judge.**

**{1}** The opinion filed June 15, 2020, is hereby withdrawn and this opinion is substituted in its place.

**{2}** Defendant Sergio Chavez-Aguirre appeals from his conviction following a jury trial of three counts of aggravated battery against a household member (no great bodily harm), contrary to NMSA 1978, Section 30-3-16(B) (2008, amended 2018); three counts of aggravated battery against a household member (deadly weapon), contrary to

Section 30-3-16(C); one count of aggravated battery against a household member (great bodily harm), contrary to Section 30-3-16(C); seven counts of intentional child abuse, contrary to NMSA 1978, Section 30-6-1(D)(2) (2009); one count of intimidation of a witness, contrary to NMSA 1978, Section 30-24-3(A)(3) (1997); and one count of criminal sexual penetration (CSP) in the second degree, contrary to NMSA 1978, Section 30-9-11(E)(3) (2009).[1] Defendant advances two arguments: (1) double jeopardy barred his conviction for aggravated battery (great bodily harm) because Victim's broken jaw could have been caused by any of the weapons that were the bases for his convictions for aggravated battery (deadly weapon) or his fists—the basis for one of his convictions for aggravated battery (no great bodily harm); and (2) the district court failed to instruct the jury on the definition of personal injury relevant to his CSP conviction, resulting in fundamental error. Agreeing in part with Defendant's double jeopardy argument, we reverse his conviction for aggravated battery (great bodily harm). We otherwise affirm.

**BACKGROUND**

**{3}**     While the timeline was not always clear, we describe the following events based on the trial testimony of Victim and two of Victim and Defendant's daughters.

**{4}**     In the evening of December 7, 2014, Victim was making dinner when Defendant received a phone call. Defendant was quiet at first, then called Victim over and put the call onto speakerphone. Defendant then asked the caller to repeat what the caller had just said to him about Victim. The caller said that Victim was cheating on Defendant. The caller also sent pictures and texts that Victim had exchanged with the person with whom she was having an affair. During the call, Defendant was holding Victim tightly by the back of her neck. When he ended the call, Defendant began punching Victim in the face, pulling her hair, yelling at her, and throwing her around.

**{5}**     Victim was then allowed to continue making dinner. However, during a second call with the caller that took place on speakerphone, Defendant began to yell at Victim, yanked her hair, threw her to the floor, pushed her, and kicked her. Defendant eventually hung up the phone. While continuing to hit and kick Victim, Defendant told Victim that she was going to die and that she would not escape from him or "a good beating."

**{6}**     Defendant then dragged Victim to the living room. Defendant instructed their oldest daughter to get a bag and to blend all of the chile that was in the refrigerator. Victim yelled at her children to call 911, but Defendant told the children that he would kill them and Victim if they called 911.

**{7}**     After their oldest daughter retrieved the bag, Defendant placed it on the floor. Their oldest daughter testified that she "freaked out" thinking that Defendant was going to kill Victim right there. Defendant then pulled down Victim's pants and proceeded to

---

1Consistent with the parties' briefing, we omit "against a household member" when referencing Defendant's aggravated battery convictions throughout this opinion.

rub the blended chiles on and in her vagina and anus. Defendant also rubbed the blended chiles in Victim's eyes and nose. Victim was crying and told Defendant to stop and not do it in front of their children. Despite Victim's pleas, Defendant did not allow the children to leave. About twenty minutes after rubbing the blended chile on Victim, Defendant sent her upstairs to shower. While Victim showered, Defendant remained downstairs with their children.

{8}     When Victim returned from her shower, Defendant continued to hit her; this time, Defendant used nunchucks. Defendant hit Victim with the nunchucks for approximately five minutes while also punching her, pulling her hair, and dragging her. Defendant then took out a knife and asked the children whether he should kill Victim. Defendant told their children that it would be their decision, and each child had to give a good reason for their decision. The children begged Defendant not to kill Victim.

{9}     Defendant eventually went to one of his daughter's bedrooms. Their oldest daughter spoke to Victim, who apologized to her daughter saying it was all Victim's fault. At Victim's instruction, their daughter then went to check on Defendant. Defendant told their daughter, "I'm sorry, but I'm going to end up killing [Victim]." Thereafter, Defendant remained in the bedroom while the rest of the family ate cake in a belated birthday celebration for one of the children. Following that, Defendant sent the children to bed. Defendant continued to yell at Victim.

{10}    Defendant wanted Victim to open her email so he could see whether she had any messages talking to the man with whom she was having an affair. After Victim had given Defendant her password and Defendant had started going through her emails, Defendant took the cord off of a speaker they had in their room. Victim tried to run downstairs, but Defendant grabbed her by the hair and pulled her to the ground. Defendant hit Victim with the cord repeatedly causing Victim to yell out. Defendant then dragged Victim down the first flight of stairs. After the second flight of stairs, Victim walked downstairs while trying to calm Defendant down. Both Victim and Defendant eventually fell asleep.

{11}    The next morning, Defendant called their oldest daughter and one of her sisters downstairs. Defendant was dressed for work and sitting on the couch with Victim. Victim got on her knees and said, "I'm sorry." Their oldest daughter noted that Victim was not speaking right and that it sounded like her jaw was broken or her lip was "kind of busted." When Defendant left to work, the family's van was gone and the keys to Victim's car could not be found. Defendant left his two oldest daughters in charge of Victim's phone. Defendant told them that if Victim got the phone and tried to call someone that he would kill them all.

{12}    Upon returning from work, Defendant told Victim that he was still mad at her, insulted her, and explained how Victim had hurt him. Defendant later told Victim that if he let her live, she would be like a slave to him. Victim agreed to do whatever Defendant wanted if he did not kill her.

**{13}** At that point, Defendant began to punch and hit Victim again. But, this time, Defendant also hit Victim in her head with a speaker. The beating caused Victim's head to bleed. Victim also testified that she began to have trouble speaking after Defendant hit her with the speaker. Defendant instructed Victim to shower.

**{14}** Victim asked if it would be alright if one of their daughters helped her get into the shower, and Defendant agreed. Their second-oldest daughter helped Victim to the shower. While in the bathroom, Victim told her daughter to take the phone away from Defendant and call the police.

**{15}** While Victim was changing after the shower, Defendant came upstairs with a metal bat and began to hit Victim with the bat. Defendant took Victim downstairs and continued to hit her with the bat. Victim testified that Defendant hit her with the bat in her legs, side, and foot. Defendant then let Victim go to the kitchen to get water. In the kitchen, Victim was joined by their second-oldest daughter, and Victim asked her whether she had the chance to call the police. While her daughter had the phone, she had not called yet. Victim begged her daughter to call the police.

**{16}** Defendant eventually let the children go upstairs. Their oldest daughter stayed on the stairs while their second-oldest daughter called the police. The daughter who called the police testified that she hoped that they would not put on the sirens so Defendant would not kill them before the police arrived. When the police knocked on the door, Defendant said that he was going to kill his family if someone called the police. Defendant also instructed Victim to lie and say that the man with whom she was having an affair beat her up.

**{17}** At trial, the jury also heard testimony from three of the officers that responded to Defendant and Victim's home on December 8, 2014; the detective who interviewed Victim, Defendant, and the children and collected evidence from the home following those interviews; the doctor who treated Victim at the hospital's emergency department on the night of December 8, 2014; and the sexual assault forensic examiner who completed a forensic violence exam on Victim. After the State rested, Defendant made a motion for directed verdict on all charged counts. The district court granted the motion only as to the kidnapping charge. Defendant did not present any evidence, and the jury found Defendant guilty on all the remaining counts. Defendant appeals.

## DISCUSSION

### I.  Defendant's Conviction for Aggravated Battery (Great Bodily Harm) Violates Double Jeopardy

**{18}** Defendant contends that his conviction for aggravated battery (great bodily harm) violated his right to be free from double jeopardy because Victim's broken jaw could have been caused by the baseball bat, the nunchucks, the cord, or Defendant's fists, each of which were the basis for his separate convictions for aggravated battery (deadly weapon) and aggravated battery (no great bodily harm). Reviewing Defendant's

contention de novo, *see State v. Lopez*, 2008-NMCA-111, ¶ 8, 144 N.M. 705, 191 P.3d 563 ("We generally apply a de novo standard of review to the constitutional question of whether there has been a double jeopardy violation."), we agree in part and reverse his conviction for aggravated battery (great bodily harm).

**{19}** The Double Jeopardy Clause "has been held to incorporate a broad and general collection of protections against several conceptually separate kinds of harm: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." *State v. Montoya*, 2013-NMSC-020, ¶ 23, 306 P.3d 426 (internal quotation marks and citation omitted). Here, Defendant's double jeopardy claim is based on multiple punishments. In the multiple punishments context, there are two types of cases: (1) when a defendant is charged with violations of multiple statutes for the same conduct, referred to as "double-description" cases; and (2) when a defendant is charged with multiple violations of the same statute based on a single course of conduct, referred to as "unit of prosecution" cases. *State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61. Defendant argues that this case should be viewed as a "unit of prosecution" case, while the State contends that this is a "double-description" case. For the reasons that follow, we agree with Defendant that this is to be analyzed as a unit of prosecution case under our case law.

**{20}** In *State v. Bello*, this Court applied a unit of prosecution analysis for convictions for two separate subsections of the drug trafficking statute—trafficking cocaine by distribution and possession with intent to distribute cocaine, eventually concluding that there was no double jeopardy violation. 2017-NMCA-049, ¶¶ 6-15, 399 P.3d 380. Acknowledging that we are bound by Supreme Court precedent, this Court "follow[ed] the approach taken by our Supreme Court in [*State v. Swick*, 2012-NMSC-018, 279 P.3d 747,] and appl[ied] a unit of prosecution analysis to [the d]efendant's double jeopardy claim even though, like the subsections of the burglary statute in *Swick*, the subsections of the trafficking statute have different elements." *Bello*, 2017-NMCA-049, ¶ 10. In other words, our Court applied the Supreme Court's analysis in *Swick*, and used the unit of prosecution standard analysis, based on multiple violations of different subsections of the same statute, even where the two subsections have different elements. Similarly, in *State v. Garcia*, this Court applied a unit of prosecution analysis, specifically examining the distinctness element when concluding that the defendant's convictions for petty misdemeanor battery and felony aggravated battery violated double jeopardy. 2009-NMCA-107, ¶¶ 8-17, 147 N.M. 150, 217 P.3d 1048. Based on those precedents, we apply the unit of prosecution test here.

**{21}** "The relevant inquiry in a unit of prosecution case is whether the Legislature intended punishment for the entire course of conduct or for each discrete act." *State v. Bernard*, 2015-NMCA-089, ¶ 17, 355 P.3d 831 (alterations, internal quotation marks, and citation omitted). To determine our Legislature's intended unit of prosecution, we use "a two-part test, both parts of which are concerned with legislative intent." *Swick*, 2012-NMSC-018, ¶ 33. "First, courts must analyze the statute at issue to determine whether the Legislature has defined the unit of prosecution." *Id.* We do this by

examining the statute's "wording, history, purpose, and the quantum of punishment that is prescribed[.]" *Id.* "If the unit of prosecution is clear from the language of the statute, the inquiry is complete." *Id.* "However, if the language is ambiguous, we proceed to the second step of the analysis in which our task is to determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute." *Bernard*, 2015-NMCA-089, ¶ 17 (internal quotation marks and citation omitted).

**{22}** In making a distinctness determination, courts consider "the six *Herron* factors: (1) time between criminal acts, (2) location of the victim during each act, (3) existence of any intervening events, (4) distinctions in the manner of committing the acts, (5) the defendant's intent, and (6) the number of victims." *State v. Olsson*, 2014-NMSC-012, ¶ 32, 324 P.3d 1230 (citing *Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624). "If there is not sufficient indicia of distinctness to separate the defendant's acts, we apply the rule of lenity to our interpretation of the statute." *Bernard*, 2015-NMCA-089, ¶ 17. "The rule of lenity requires that we interpret the statute in the defendant's favor by invoking the presumption that the Legislature did not intend to create separately punishable offenses." *Id.*

**{23}** Here, it is undisputed that we are only concerned with the second part of the unit of prosecution inquiry—distinctness. As we conduct the distinctness inquiry here, we note that "we are doing a substantially similar analysis when we conduct a unitary conduct inquiry in double description cases as when we conduct a unit-of-prosecution inquiry." *State v. Bernal*, 2006-NMSC-050, ¶ 16, 140 N.M. 644, 146 P.3d 289. "In each case, we attempt to determine, based upon the specific facts of each case, whether a defendant's activity is better characterized as one unitary act, or multiple, distinct acts, consistent with legislative intent." *Id.* With this in mind, we conclude that the unitary conduct analysis in *State v. Montoya*, 2011-NMCA-074, 150 N.M. 415, 259 P.3d 820, is instructive here.

**{24}** In relevant part, the defendant in *Montoya* argued that his conviction for second degree CSP (commission of a felony) and kidnapping violated double jeopardy. *Id.* ¶ 28. To convict the defendant of second degree CSP, the jury was required to find that the defendant (1) "caused [the v]ictim to engage in sexual intercourse" and (2) "committed this act during the commission of either kidnap[p]ing or aggravated burglary." *Id.* ¶ 35 (alteration and internal quotation marks omitted). In order to convict the defendant of kidnapping, the jury had to find that the defendant (1) "restrained or confined [the v]ictim by force or intimidation" and (2) "intended to hold [the v]ictim against her will to inflict a sexual offense on [her]." *Id.* (alteration and internal quotation marks omitted). This Court noted that precedent indicated that "because some force or restraint is involved in every sexual penetration without consent, kidnap[p]ing cannot be charged out of every CSP without a showing of force or restraint separate from the CSP." *Id.* ¶ 38.

**{25}** The state argued that such force or restraint existed "because the jury could have based the kidnap[p]ing conviction on [the d]efendant's confining [the v]ictim by blocking the highway with his truck rather than on the force [the d]efendant exerted in restraining

[the v]ictim while committing CSP." *Id.* However, this Court rejected that argument because it was "unable to determine from the record whether the jury found that the kidnap[p]ing was accomplished by the truck's confinement of [the v]ictim's vehicle or by [the d]efendant's restraint of [the v]ictim inside the vehicle." *Id.* ¶ 39. This Court further noted that the instruction given to the jury "supported either theory of kidnap[p]ing." *Id.* The Court then explained that, "[u]nder such circumstances, we must reverse a conviction if one of the alternative bases for the conviction provided in the jury instructions is legally inadequate because it violates a defendant's constitutional right to be free from double jeopardy." *Id.* (internal quotation marks and citation omitted). Accordingly, this Court concluded that the conduct supporting "both of the convictions was unitary." *Id.*

**{26}** Like the kidnapping jury instruction in *Montoya*, the aggravated battery (great bodily harm) instruction here allowed a number of different theories—some of which would violate the principles of double jeopardy—to support a conviction. Furthermore, the record in this case, like the record in *Montoya*, does not allow us to determine whether the jury's conviction was based on one of the theories that would not violate double jeopardy. We explain.

**{27}** To find Defendant guilty of aggravated battery (great bodily harm), the jury was instructed that the State must prove the following elements beyond a reasonable doubt:

1. [D]efendant touched or applied force to [Victim] by breaking her jaw[;]
2. [D]efendant intended to injure [Victim;]
3. [D]efendant caused great bodily harm to [Victim;]
4. [Victim] was a household member of [D]efendant[;]
5. This happened in New Mexico on or about the 7-8th [d]ay of December, 2014.

*See* UJI 14-393 NMRA. Unlike the instructions for the three counts of aggravated battery (deadly weapon) that separately required the jury to find that Defendant touched or applied force to Victim with the baseball bat, nunchucks, and cord, this instruction did not identify the manner in which Defendant touched or applied force to Victim. *Compare* UJI 14-392 NMRA, use note 2 (requiring the "[u]se [of] ordinary language to describe the touching or application of force" within the first element of the aggravated battery (deadly weapon) instruction), *with* UJI 14-393, use note 2 (requiring the same within the first element of the aggravated battery (great bodily harm) instruction). Furthermore, as the State conceded at trial during its closing argument and on appeal, it was not clear when or how Victim's jaw was broken.

**{28}** Accordingly, under the given instruction, the jury could have found Defendant guilty of aggravated battery (great bodily harm) based on any conduct that resulted in Victim's jaw being broken. This includes theories that do not offend double jeopardy— e.g., Defendant broke Victim's jaw with his fists or by hitting her with the speaker—as well as theories that would offend double jeopardy—e.g., Defendant broke Victim's jaw by hitting her with the bat, the nunchucks, or the cord. Based on the record in front of

us, we cannot determine whether the jury found that the aggravated battery (great bodily harm) was accomplished through conduct that would not offend double jeopardy. Accordingly, we must conclude that the conduct underlying both of the convictions was not distinct because the conduct supporting three possible alternative bases for the aggravated battery (great bodily harm) was the same conduct that supported Defendant's three convictions for aggravated battery (deadly weapon). *See Montoya*, 2011-NMCA-074, ¶ 39.

**{29}** Our Supreme Court has recognized that the presumption we have applied in this case can be rebutted by evidence of sufficient indicia of distinctness separating the offenses. *State v. Sena*, 2020-NMSC-___, ¶¶ 54, 56, ___ P.3d ____ (S-1-SC-36932, June 25, 2020). We are not persuaded, however, that it has been rebutted here. Arguing that the presumption was rebutted in this case, the State continues to assert that it was most likely the speaker that broke Victim's jaw. To support that argument, the State focuses on Victim's testimony that suggested she had trouble speaking after being hit with the speaker. However, the State's argument ignores that Victim's oldest daughter testified that Victim had trouble speaking in the morning of the second day, before Victim was battered with the speaker. The discrepancy in the evidence of when Victim first had trouble speaking—a symptom the State argued was indicative of Victim's jaw being broken—demonstrates why we cannot conclude that the presumption has been rebutted in this case. Without knowing which criminal act led to Victim's broken jaw, we are unable to conclude that the conduct in this case was distinct. *See id.* ¶ 46 ("Unitary conduct is not present when one crime is completed before another is committed, or when the force used to commit a crime is separate from the force used to commit another crime."); *Olsson*, 2014-NMSC-012, ¶ 32 (identifying the *Herron* distinctness factors as the "(1) time between criminal acts, (2) location of the victim during each act, (3) existence of any intervening events, (4) distinctions in the manner of committing the acts, (5) the defendant's intent, and (6) the number of victims"). Accordingly, we conclude that the presumption has not been rebutted in this case.

**{30}** We therefore reverse Defendant's conviction for aggravated battery (great bodily harm) and remand for the district court to vacate that conviction. *See Montoya*, 2011-NMCA-074, ¶ 39 ("[W]e must reverse a conviction if one of the alternative bases for the conviction provided in the jury instruction is legally inadequate because it violates a defendant's constitutional right to be free from double jeopardy." (internal quotation marks and citation omitted)).

## II.     The Failure to Instruct on the Definition of "Personal Injury" Was Not Fundamental Error

**{31}** Defendant argues that the jury was not properly instructed as to the definition of personal injury with regard to the charge of CSP. Defendant argues that the instruction given removed from the jury's consideration the question of whether "painful burning" constituted personal injury under the law. As Defendant acknowledges, this argument is unpreserved because he did not request a definitional instruction. Accordingly, we apply the fundamental error standard of review. *See State v. Benally*, 2001-NMSC-033, ¶ 12,

131 N.M. 258, 34 P.3d 1134 ("The standard of review we apply to jury instructions depends on whether the issue has been preserved. If the error has been preserved[,] we review the instructions for reversible error. If not, we review for fundamental error." (citation omitted)). Nevertheless, even when reviewing for fundamental error, "we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *Id.* (internal quotation marks and citation omitted).

**{32}**   The jury was instructed to find Defendant guilty of second degree CSP (personal injury) if it found that the State proved the following four elements beyond a reasonable doubt: (1) "[D]efendant caused the insertion[,] to any extent, of a finger and or chile into the vagina and anus of [Victim]"; (2) "[D]efendant used physical force or physical violence"; (3) "[D]efendant's actions resulted in chile to be placed in and on [Victim's] vagina and anus, causing painful burning"; and (4) "[t]his happened on or about the 7-8th day of December, 2014." *See* UJI 14-946 NMRA. Alternatively, the jury was instructed to find Defendant guilty of third degree CSP (use of force or physical violence), if the State proved the following four elements beyond a reasonable doubt: (1) "[D]efendant caused the insertion, to any extent, of a finger or chile into the vagina or anus of [Victim]"; (2) "[D]efendant used physical force or physical violence"; (3) "[D]efendant's act was unlawful"; and (4) "[t]his happened in New Mexico on or about the 7-8th day of December, 2014." *See* UJI 14-941 NMRA.[2]

**{33}**   Defendant argues "the jury never knew that the difference between the two CSP instructions was a finding that the CSP resulted in 'personal injury,' a term that is defined by law." However, as Defendant notes, "[t]he Uniform Jury Instruction for [CSP] does not include a definition of [']personal injury,['] and no separate definitional instruction exists." *See* UJI 14-946. Therefore, although Defendant acknowledges that the instructions given in this case were consistent with the New Mexico Uniform Jury Instructions, Defendant argues that the lack of a definition of "personal injury" rises to fundamental error. We are unpersuaded.

**{34}**   UJI 14-946 provides that the portion of the instruction addressing the injuries inflicted upon the victim should read: "3. The defendant's acts resulted in _____," and directs readers to Use Note 6, which reads: "Name victim and describe personal injury or injuries. *See* [NMSA 1978, Section 30-9-10(D) (2005)] for types of personal injuries." Further, the committee commentary to UJI 14-946 provides:

> The statutory definition of 'personal injury' is broad and includes various types of personal injuries. *It is therefore a question of law as to whether a particular injury constitutes an aggravating factor sufficient to support the charge.* 'Personal injury' includes but is not limited to: disfigurement, mental anguish, chronic or recurrent pain, pregnancy, or disease or injury to a sexual or reproductive organ.

---

2We note that the jury was also instructed to consider whether Defendant committed the offense of criminal sexual contact in addition to these two instructions on criminal sexual penetration. That instruction is not challenged by Defendant.

(Emphasis added.) Because the question of whether a particular injury is sufficient to support a charge of second degree CSP (personal injury) is a question of law, it was for the district court to decide and not the jury. We note that Defendant has not asserted that, as a matter of law, the injury involved in this case could not be used to support his second degree CSP charge. Accordingly, on this basis, we cannot conclude that the omission of the definitional instruction was fundamental error.

**{35}**   Nevertheless, even if we were to assume that it was a question for the jury, we still conclude that omission of a definition of "personal injury" did not result in fundamental error.[3] We note that, generally, "a missing definition cannot result in the sort of 'fundamental unfairness' that undermines the integrity of the judicial system." *State v. Barber*, 2004-NMSC-019, ¶ 20, 135 N.M. 621, 92 P.3d 633; *see id.* ¶¶ 10, 32 (concluding there was no fundamental error where a trial court failed to give a definitional instruction of possession in a possession of methamphetamine case, even where the defendant was entitled to it pursuant to the UJIs); *State v. Anderson*, 2016-NMCA-007, ¶ 15, 364 P.3d 306 ("We recognize that courts generally disfavor finding fundamental error where a definition is omitted from jury instructions."). In this case, we do not believe that there was potential for jury confusion as to whether personal injury resulted from Defendant's actions of chile being placed in and on Victim's vagina or anus, causing painful burning. *See Benally*, 2001-NMSC-033, ¶ 12.

**{36}**   The legal definition of "personal injury" is rooted in common discourse and therefore does not present ambiguity that might confuse jurors. *See Barber*, 2004-NMSC-019, ¶ 22 (acknowledging that potential for jury confusion exists where the legal definition of a term is "not necessarily rooted in common discourse"). Furthermore, the definition of "personal injury" is one that merely amplifies an element instruction, rather than one that implicates "a critical determination akin to a missing elements instruction[.]" *Id.* ¶¶ 25-26 (internal quotation marks and citation omitted). Accordingly, on this basis, we also conclude that giving the essential-elements jury instruction— which does not call for a definitional instruction to be given—was not fundamental error.

## CONCLUSION

**{37}**   For the foregoing reasons, we reverse Defendant's conviction for aggravated battery (great bodily harm) based on double jeopardy principles. We otherwise affirm.

**{38}   IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

---

3We recognize that "the committee commentary to a jury instruction is only persuasive to the extent that it correctly states the law." *State v. Suazo*, 2017-NMSC-011, ¶ 20, 390 P.3d 674. However, we need not decide whether the committee commentary to UJI 14-946 is a correct statement of law in this case because we conclude that the omission of the definitional instruction was not fundamental error whether it was a question of law for the Court or a question of fact for the jury.

**JULIE J. VARGAS, Judge**

**SHAMMARA H. HENDERSON, Judge**